# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **INTERNATIONAL MARINE, L.L.C., ET AL** | **CIVIL ACTION** |
| **VERSUS** | **NO. 10-0044** |
| **DELTA TOWING, L.L.C.** | **SECTION "D"(2)** |

## ORDER AND REASONS

Before the court are the following motions:

(1) Motion for Leave to File Amended Witness List (Rec. Doc. 69) filed by Plaintiffs, International Marine, L.L.C. and International Offshore Services, L.L.C.;

(2) Second Motion for Summary Judgment (Doc. No. 67) filed by Defendant, Delta Towing, L.L.C.; and

(3) Motion for Leave to File Supplement to Motion for Summary Judgment and to Reconsider Summary Judgment (Doc. No. 72) filed by Plaintiffs, International Marine, L.L.C. and International Offshore Services, L.L.C.

The motions, set for hearing on Wednesday, February 23, 2011, are before the court on briefs, without oral argument. Having considered the memoranda of counsel, the record, and the applicable law and for the reasons set forth below, the court finds that Plaintiff's Motion for Leave to File Amended Witness List (Rec. Doc. 69) should be DENIED. Because there are no genuine issues of material fact as to Defendant's Second Motion for Summary Judgment (Rec. Doc. 67) it should be GRANTED IN PART as to liability for liquidated damages[1] and,

---

[1]There are material issues of fact as to the calculation of damages. *See* Hercules Audit (Δ's Exh. 12 and 13); *compare* International Marine's Audit Details (Δ's Exh. 14).

1

concomitantly, Plaintiff's Cross-Motion for Summary Judgment on Reconsideration and as Supplemented (Rec. Doc. 72) should be DENIED.

## I. INTRODUCTION

This matter arises out of the September 8, 2006 Vessel Sales Agreement (VSA) between Plaintiff International Marine, L.L.C. (IM) and Defendant Delta Towing, L.L.C. (Delta Towing). Pursuant to the VSA, Delta Towing sold and IM purchased two vessels, the DELTA TEAM and DELTA SKIPPER, for a total purchase price of $4,000,000. ( *See* Vessel Sales Agreement attached to Complaint, at § 2).  The nub of the dispute are the chartering covenants/restrictions and the companion liquidated damages  provision of the VSA, respectively entitled ¶11F "Covenant Regarding Name/Use of Vessels/Hiring Crew"and ¶11G "Liquidated Damages." Indeed, the sole issue addressed in the cross-motions for summary judgment is whether the liquidated damages provision (¶11G) of the VSA reasonably represents Delta Towing's anticipated damages from breach of the restrictive covenants set forth in paragraph 11F of the VSA.

Plaintiffs'  Declaratory Judgment Complaint under the court's admiralty and maritime jurisdiction seeks resolution of Delta Towing's claims that IM breached the chartering provisions of the VSA in that it failed to pay 10% of charter hire and is entitled to a liquidated damages in the amount of two hundred fifty thousand ($250,000) for every "occurrence" in breach of the chartering agreement in accordance with §§ 11F and 11G of the VSA.  More particularly, Defendant Delta Towing seeks recovery of approximately $9 million in penalties resulting from thirty-six (36) alleged "occurrences" or breaches of the chartering restrictions.  It is undisputed that Defendant's ten percent (10%) share of the charter hire with respect to the

2

aforesaid "occurrences" would total approximately $90,950.33. Plaintiffs have previously tendered payment of this amount in two checks, and Defendant has held these checks without negotiating them.  (*See* Complaint at ¶¶ 4.3-4.4).  In sum, Plaintiffs seek judgment declaring that: (1) they have not breached the chartering provision of the subject VSA; and (2) the "liquidated damages" provision contained in the VSA is an unenforceable penalty.[2]

Via Second Motion for Summary Judgment, Delta Towing seeks enforcement of the Liquidated Damages provisions – *i.e.*, summary judgment ordering International Marine to pay Delta in accordance with the Paragraph 11(G) of the VSA.  Defendant contends that International Marine has utterly failed to adduce any evidence that the amount it negotiated and agreed upon – $250,000 per occurrence as liquidated damages – bears no reasonable relationship to Delta Towing's *anticipated* damages.  Delta submits that the evidence of their negotiations, much of which is in writing, amply demonstrates that the liquidated damage amount per occurrence is integrally related to: (1) the fact that the vessels were sold below their market value as specifically set forth in the VSA; (2) Delta Towing's potential loss of customers, market share and business opportunities; and (3) Delta Towing's potential to charter the vessels and earn 100% of the revenue, possibly with lucrative long-term charters.[3]  Defendant seeks judgment enforcing the liquidated damages provision in the VSA and a corresponding award of damages per International Marine's alleged thirty-six (36) violations.

---

[2] *See* International Marine's Memorandum in Support of Motion for Leave to File Supplement to Motion for Reconsideration and for Reconsideration (Rec. Doc. 72); International Marine's Reply in Support of Motion for Reconsideration (Rec. Doc. 90).

[3] *See* Delta Towing's Memorandum in Support of Second Motion for Summary Judgment at pp. 23-24 (Rec. Doc. 67); Delta Towing's Reply in Support of Second Motion for Summary Judgment (Rec. Doc. 88).

## II.  PLAINTIFFS' MOTION FOR LEAVE TO FILE AMENDED WITNESS LIST
### AND ALTERNATIVE MOTION TO EXCLUDE
### THE 2006 RIVERS AND GULF SURVEYS AS INADMISSIBLE HEARSAY

*Parties' Positions*

Plaintiffs contend that Fed. R. Civ. P. 16(b) "good cause" exists for allowing them to

amend their witness list beyond the deadline[4] for the purpose of adding Mr. Jules Shubert,

President of Rivers & Gulf Marine Surveyors, Inc., as a *rebuttal* witness.  Plaintiffs explain that,

on December 15, 2010 in response to Delta Towing's second request for production of

documents, they produced Rivers & Gulf Surveys regarding valuation of the DELTA TEAM and

DELTA SKIPPER.[5]  In addition, plaintiffs' experts (Stephen Williams and Norman Dufour) as

well as Delta Towing's expert Barry Matherne were deposed on January 6 and 7, 2011,

respectively.  Thereafter, it became clear to plaintiffs that Delta would rely on said surveys and

were going to use them as exhibits during the trial.  Plaintiffs object to the surveys contending

that they constitute inadmissible hearsay, failing which, they seek to call Mr. Shubert as a

rebuttal witness.  Plaintiffs submit that they offered Delta the opportunity to depose him but that

defendant declined the offer.

Defendant counters that Plaintiffs' argument – that they were unaware of the importance

of surveys indicating the fair market value of the vessels within two weeks of sale[6] –  is

---

[4]Preliminary Scheduling Order signed April 29, 2010 (witness lists due no later than 11/26/2010; plaintiffs' expert reports due no later than 10/28/2010) (Rec. Doc. 17).

[5]Plaintiffs' Responses to Delta Towing's Second Set of Requests for Production (Pltf's Exh. A/Rec. Doc. 69-2).

[6]*See* Deposition of Stephen Williams taken January 6, 2011 at p. 86, 91-92 (admitting that the 2006 Rivers and Gulf Surveys were performed on September 22, 2006 just over two weeks after International Marine acquired the boats, meaning DELTA TEAM and the DELTA SKIPPER) (Δ's Exh. 5/Rec. Doc. 80-5 at p. 2-5).

disingenuous.  Delta Towing highlights that the very provision of the VSA at issue in this case

states: "The consideration for the provisions in paragraph 11F and 11G is that the above

**Purchase Price is below the fair market price of the Vessels at the time of sale** ..."[7]  In

addition, plaintiffs fail show how Mr. Shubert's testimony is relevant since he is not the author

of the 2006 Rivers & Gulf Surveys and thus, fails to qualify as a rebuttal witness.  Moreover,

Defendant notes that, early on in the proceedings (August 4, 2010), Barry Matherne was deposed

as Delta Towing's Chief Operating Officer and General Manager and specifically questioned by

plaintiff's counsel about the valuation of vessel, to wit:

| | |
|---|---|
| Pltf's Counsel: | Okay.  Let's keep going. **The lawsuit keeps referring to the vessels being below their fair market value.** You said that you're not aware of a valuation of those vessels? |
| Mr. Matherne: | No. Not a valuation of the vessels, no. |
| Pltf's Counsel: | Do you know what the market value was at the time? Did you know at the time what the market value ... of those vessels was? |
| Mr. Matherne: | – market value is he wouldn't have sold the boats for two million if we would have known they was competing against us.[8] |

Delta Towing further highlights that International Marine produced the 2006 Rivers & Gulf

Surveys[9] performed within two weeks of the September 8, 2006 without objection in response to

relevant discovery.  Defendant contends that it is clear from Stephen Williams' testimony that

the survey reports are admissible under 803(6) of the Federal Rules of Evidence, in that the

---

[7]*See* VSA at ¶ 11G re: "<u>Liquidated Damages</u>"(emphasis added) (Δ's Exh. 1/Rec. Doc. 80-2 at p. 7).

[8]Videotaped Deposition of Barry T. Matherne taken August 4, 2010 at pp. 107-08 (Δ's Exh. 3/Rec. Doc. 80-3 at p. 2-3).

[9]*See* Rivers and Gulf Survey Nos. 06-16309 and 06-16308 with survey dates of 9/22/06 and report dates of 10/6/06 with regarding the SKIPPER and the TEAM (Δ's Exh. 1/Rec. Doc. 80-1).

surveys were completed in the ordinary course of business, having been requested by International Marine's Bank (Wachovia) because Plaintiff was borrowing money to finish up its barge fleet.[10]  In addition to admitting both surveys as exhibits during the Williams' Deposition without objection,[11] Defendant also notes that Plaintiffs provided the 2006 Rivers & Gulf Surveys to their own expert (Norm Dufour) for review in completing his appraisal of the subject vessels.[12]  Delta Towing contends that, in light of the foregoing, IM has waived any objection as to the surveys' authenticity and admissibility.  Finally, as to their trustworthiness, Delta Towing highlights Williams's testimony that IM's bank relied on the valuations set forth in the Rivers & Gulf 2006 Survey Reports for business/financial reasons – *i.e.*, to ensure that its business loan to IM was sufficiently collateralized.[13]

*Analysis*

Initially, the court notes that evidence must be relevant and that means having any tendency to make the existence of any fact that is of consequence more probable or less probable than it would be without the evidence. *See* Fed. Rule of Evid. 401.  All relevant evidence is admissible, except as provided by the United States Constitution, an act of Congress, other rules of evidence, or other Supreme Court rules pursuant to statutory authority, which includes the proscription against hearsay.  *See* Fed. Rule Evid. 402.

---

[10]Deposition of Stephen Williams taken on January 6, 2011 at pp. 85-87 (Δ's Exh. 5/Doc. #80-5).

[11]*Id.* at pp. 86, 91.

[12]*See* International Marine's Responses to Delta Towing's Second Set of Discovery Requests at Items 14 and 15 (referencing Dufour's working regarding the valuation of TEAM and SKIPPER at time of purchase by IM on 9/8/06) (Δ Exh. 4/Doc. #80-4).

[13]Deposition of Stephen Williams taken on January 6, 2011 at pp. 84-87.

Rule 803(6) creates an exception to the hearsay rule for "records kept in the course of a regularly conducted business activity," upon the testimony of the custodian of the records or a qualified witness.[14]   To qualify under the business records exception to the hearsay doctrine, which excludes all out of court statements offered for the truth of the matter asserted, a report must have been made at or near the time of the opinions expressed, by someone with knowledge or from other information transmitted by a person with knowledge.  *See* Fed. Rule Evid. 803(6).[15]  The rule also requires that the record be kept in the ordinary course of business activity and that it was the regular practice of that business activity to make the record.  *See id*.  All of the aforementioned requirements can be shown by the testimony of a custodian or other qualified witness.  *See id*.

The relevance of the surveys accomplished within weeks of the sale of the vessels is not genuinely disputed.  Clearly, the surveys are relevant to the issue of the *under*valuation of the vessels at the time of their sale to Plaintiffs, as set forth in the VSA. (Δ's Exh. 2/Rec. Doc. 80-2).

Turning to the business records exception, plaintiffs argue that the proper foundation has

---

[14]*See United States v. Duncan,* 919 F.2d, 981, 986 (5th Cir.), *cert. denied*, 500 U.S. 926, 111 S.Ct. 2036, 114 L.Ed.2d 121 (1991) (citing *United States v. Iredia*, 866 F.2d 114, 119-20 (5th Cir.), *cert. denied,* 492 U.S. 921, 109 S.Ct. 3250, 106 L.Ed.2d 596 (1989)).

[15]Rule 803(6) provides in pertinent part:
**Records of Regularly Conducted Activity**. A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness or by certification that complies with Rule 902(11), Rule 902(12) or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness....

7

not been laid that would satisfy the requirements of the rule.  The Court disagrees.

Stephen Williams (Williams), Chief Executive of International Marine, who negotiated the purchase of the boats (along with the company's attorney (Peter Rouse)) and signed the September 8, 2006 VSA on behalf of International Marine, undoubtedly a qualifies witness under the rule.  He testified that the surveys were prepared for Plaintiffs' bank (Wachovia) to ascertain the value of the vessels to their satisfaction, because International Marine was borrowing money to finish up its barge fleet.  All indications are that the 2006 Rivers & Gulf surveys were prepared in the ordinary course of International Marine's barge fleet business.[16] The surveys themselves corroborate Williams' testimony in that their stated purpose was to discern the "condition and valuation for financial purposes."[17]  The surveyor's notes are reiterated at the conclusion of the reports and all of the surveys are signed by the attending surveyor (Carl A. Guidry), satisfying the first hand knowledge requirement.   Moreover, it is undisputed that Guidry actually inspected both the TEAM and the SKIPPER.[18]   It is undisputed that International Marine produced the surveys in response to Defendant's relevant discovery requests[19] and provided same to its own expert Norm Dufour,[20] who submitted an appraisal

---

[16]*See* Deposition of Stephen Williams taken January 6, 2011 at p. 86 (Δ's Exh. 5/Rec. Doc. 80-5).

[17]*See* 2006 Rivers & Gulf Survey Nos. 06-16308 and 06-16309 (each noting that the "Type of Survey" was to discern the TEAM and SKIPPER's  "condition and valuation for financial purposes") (Δ's Exh. 1/Rec. Doc. 80-1).

[18]*See* Deposition of Stephen Williams at p. 88.

[19]*See Federal Trade Commission v. Hughes,* 710 F.Supp. 1520, 1522 (N. D. Tex. 1989) (production of documents is an admission of authenticity).

[20]Dufour's valuation was not done in the ordinary course of business at or near the time of the sale, but rather more recently and for purposes of this litigation and without ever having

relative to the value of the subject vessels.

Turning to the issue of authentication (Fed. R. Evid. 901(a)), the standard for authentication is not a burdensome one.[21] "A proponent may authenticate a document with circumstantial evidence, including the document's own distinctive characteristics and the circumstances surrounding its discovery."[22] The Fifth Circuit "does not require conclusive proof of authenticity before allowing the admission of disputed evidence .... Rule 901 does not limit the type of evidence allowed to authenticate a document. It merely requires some evidence which is sufficient to support a finding that the evidence in question is what its proponent claims it to be."[23]

The lynchpin of the business record exception trustworthiness. The "inherent reliability of business records is 'supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation."[24] "Whether evidence is admissible under Rule 803(6) is chiefly a matter of trustworthiness."[25]

---

actually "surveyed" either the DELTA TEAM or DELTA SKIPPER.

[21]*United States v. Barlow*, 568 F.3d 215, 220 (5th Cir.2009).

[22]*U.S. v. Jackson,*625 F.3d 875, (5th Cir. 2010) (quoting *In re McLain*, 516 F.3d 301, 308 (5th Cir.2008) (internal citations omitted)).

[23]*United States v. Jimenez Lopez*, 873 F.2d 769, 772 (5th Cir. 1989).

[24]*United States v. Wells*, 262 F.3d 455, 462 (5th Cir. 2001) (*quoting* Fed. R. Evid. 803(6) Committee Note).

[25]*Id.* at 459-60 (quotations omitted); *United States v. Skilling,* 2006 WL 1006622 (S. D. Tex. 2006) (citing *Mississippi River Grain Elevator, Inc. v. Bartlett & Co. Grain,* 659 F.2d 1314, 1319 (5th Cir. 1981).

Rule 803(6) does not require that the records be prepared by the business which has custody of them.[26]  The party seeking to introduce them does not have to present the testimony of the party who kept the record or supervised its preparation.[27]  Testimony of the custodian of the record or other qualified witness that the record is authentic and was made and kept in the ordinary course of business will suffice under Rule 803(6).[28]  "[T]he witness need not have personal knowledge of the record keeping practice or circumstances under which the objected to records were kept."[29]  "[T]he business records exception has been construed generously in favor of admissibility."[30]  This rule was specifically designed to "relax [] the requirement of producing witnesses, or accounting for nonproduction of, all participants in the process of gathering, transmitting and recording information which the common law had evolved," – *i.e.*, "a burdensome and crippling aspect of using records of this type."[31]

---

[26]*Duncan*, 919 F.2d at 986; *Rosenberg v. Collins,* 624 F.2d 659, 665 (5th Cir. 1980) ("Any person in a position to attest to the authenticity of certain records is competent to lay the foundation for admissibility of the records; he need not have been the preparer of the record, nor must he personally attest to the accuracy of the information contained in the records.").

[27]*See United States v. Central Gulf Lines, Inc.,* 575 F.Supp. 1430, 1433 (E. D. La.) (quoting *United States v. Veytia-Bravo,* 603 F.2d 1187, 1191-92 (5th Cri. 1979), *reh'g en banc denied,* 607 F.2d 1006, *cert. denied,* 444 U.S. 1024 (1980)), *aff'd,* 747 F.2d 315 (5th Cir. 1984).

[28]*United States Commodity Futures Trading Commission v. Dizona*, 594 F.3d 408, 415 (5th Cir. 2010) (quoting *United States v. Brown,* 553 F.3d 768, 792 (5th Cir. 2008), *cert. denied,* 130 S.Ct. 246, 175 L.Ed.2d 168 (2009));

[29]*United States v. Box,* 50 F.3d 345, 356 (5th Cir.), *cert. denied,* 516 U.S. 918, 116 S.Ct. 309, 133 L.Ed.2d 213 (1995)).

[30]*Conoco, Inc. v. Department of Energy,* 99 F.3d 387, 391 (Fed. Cir. 1997).

[31]*Small v. E.I. DuPont de Nemours & Co.,* 2006 WL 2710439 (E. D. La. 2006) *(quoting* Fed. R. Evid. 803(6) Advisory Comm. Notes (1972) and further noting that the "presumed reliability of information contained in ordinary business records overcomes the hearsay objection because the rule assumes that '[a]ll participants, including observer or participant furnishing the

Here, as in *Hughes*,[32] IM (the party objecting to the exhibit) produced it.  It did so in response to a request for production of documents and testified as to the surveys in response to an interrogatory.[33]  Both Williams and Dufour testified as to information contained in the surveys, authenticating them.[34]  Obviously, the surveys are relevant, International Marine provided them to its expert, Dufour.  Additionally, the surveys establish a range of values (market and replacement) given the subject vessels within weeks of their sale to International Marine.  Moreover, the surveys are probative in assessing whether purchase price of the vessels at the time of their sale to International Marine was in fact below market price as stated in the VSA and agreed to by the parties.

The surveys are not expert testimony requiring a "rebuttal witness" as plaintiff has suggested by seeking, in the alternative, leave to amend their witness list to add Mr. Shubert.  Rather, the 2006 Rivers & Gulf Surveys are business records; they are documentary evidence that need not meet the evidentiary standards of expert testimony.

Delta Towing has met its burden with respect to the admissibility of the challenged business records.  The court finds that there is sufficient evidence of the surveys' authenticity and trustworthiness to consider those documents on the parties' cross-motions for summary judgment.  Nothing suggests that the valuations are forgeries, spurious or accomplished for a

---

information to be recorded, were acting routinely, under a duty of accuracy, with employer reliance on the result, or in short, 'in the regular course of business.'" ).

[32]*Federal Trade Commission v. Hughes,* 710 F.Supp. 1520, 1522 (N. D. Tex. 1989).

[33]*See* International Marine's Responses to Defendant's Second Set of Discovery Requests (Δ's Exh. 4/Doc. #80-4).

[34]Williams' Deposition at pp. 86, 91, 92 (Δ's Exh. 5/Doc. #80-5); Deposition of Norman Dufour taken January 7, 2011, at pp. 51-53 (Δ's Exh. 6/Doc. #80-6).

purpose other than International Marine's routine business – that is, securing a business loan from its bank for purposes of maintenance and upkeep of its barge fleet.

As to the belated alternative request to amend Plaintiffs' witness list to add Mr. Shubert, the factors considered by the court enumerated below[35] do not counsel in favor of flexing the schedule at this late stage of the proceedings.

Accordingly, the court denies Plaintiffs' motion to exclude the 2006 Rivers & Gulf Surveys.  Additionally and for reasons previously noted, Plaintiff's alternative motion to amend the witness list to add Mr. Shubert, who did not author any of the vessel surveys at issue, is DENIED for lack of Rule 16(b) "good cause."

## II.  CROSS MOTIONS FOR SUMMARY JUDGMENT

*Applicable Legal Standards*

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56.  Under Rule 56 ( c ) , the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."[36]  If the burden of proof at trial lies with the nonmoving

---

[35]*See Campbell v. Keystone Aerial Surveys, Inc.*, 138 F.3d 996, 1000 (5th Cir.1998) (quoting *Davis v. Duplantis*, 448 F.2d 918, 921 (5th Cir.1971)) (noting that a district court has "wide latitude" in pretrial matters to issue orders based on "intelligent flexibility" and instructin that there four factors to consider in determining whether the testimony of a late-designated expert witness should be permitted: (1) the importance of the witness's testimony; (2) the prejudice to the opposing party if the witness is allowed to testify; (3) the possibility that a continuance would cure potential prejudice; and (4) the explanation given for the failure to identify the witness."

[36]*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir.2002).

party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element or claim.[37]   The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case.[38]  "An issue is material if its resolution could affect the outcome of the action."[39]

If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response.[40]  When the moving party has met its Rule 56 ( c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim.[41]  The nonmovant must do more than show that there is some metaphysical doubt as to the material facts.[42]

---

[37] *Celotex*, 477 U.S. at 330.

[38] *Bourdeaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir.2005).

[39] *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir.2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

[40] *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir.2002).

[41] *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir.2004).

[42] *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir.2003).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.[43]  "Rule 56 'mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.' '[44]

*The Vessel Sales Agreement*

In July 2006, Stephen Williams (Williams), Chief Executive of International Marine, contacted Darren Vorst (Vorst), Treasurer of the Offshore Drilling Company (TODCO), the parent company of Delta Towing, to inquire about the purchase of assets by International Marine from Delta Towing.  (Δ's Exh. 3, pp.1-5).  On July 17, 2006, Williams offered to purchase the DELTA MOVER, the DELTA SKIPPER and the DELTA TEAM for a total of $4 million. (Δ's Exh. 3, p. 24).  On August 25, 2006, TODCO offered to sell the DELTA TEAM and DELTA SKIPPER to International Marine for $4 million "pursuant to the attached purchase sale agreement," which was an early draft of the VSA. (Δ's Exh. 3, p. 42).   The draft agreement included at Section 11F a provision entitled "Covenant Regarding Name/Use of Vessels/Hiring Crews" and at Section 11G a provision entitled "Liquidated Damages."  Early drafts of the VSA show that the Liquidated Damages amount proposed was originally $4,000,000 per violation, which was reduced in a later draft to $2,000,000 and, ultimately, down from $400,000 to

---

[43]*Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir.2002); *Anderson*, 477 U.S. at 255.

[44]*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (quoting *Celotex*, 477 U.S. at 322).

14

$250,000 per occurrence.  *See* Early Drafts of the VSA  (Δ's Exh. 4, *in globo*).[45]

On August 28, 2006, counsel for International Marine addressed concerns with the draft

VSA, stating:

> Paragraph F is the most troubling part of the agreement.  It would prohibit the use
> of the vessels in the Gulf.  It prohibits the potential hiring of crew members.
> Finally the penalty of $400,000.00 is excessive given the nature of the contract.  I
> would suggest that restrictions concerning the Gulf be removed.  I would suggest
> that Steve agree not to hire anyone working directly for Delta.  However, if a
> crew member terminates his employment with Delta and hires on with an
> unrelated company and then applies with International, International should be
> allowed to employ him.  Finally, the penalty should be reduced to a sum agreed
> upon with Steve, but I would hope that it would be a number significantly lower
> than the proposed figure [meaning $400,000 per occurrence]. ( (Δ's Exh. 3, p.
> 44).

Most notably, there was no objection to the Covenant in principle regarding use of vessels in

Paragraph 11F or the Liquidated Damages (¶ 11G); rather, the only objections were as to the

geographic restriction on the use of vessels and quantum of liquidated damages, which was

eventually set by agreement at the substantially reduced amount of $250,000.  (Δ's Exh. 3, p.

47).

The change was confirmed via September 6, 2006 email from International Marine's counsel

(Peter Rouse) stating:

> It is my understanding that you and Steve have discussed the penalty [meaning
> Liquidated Damages] and it will be reduced to $250,000.00 and $50,000.00
> regarding employee violations.  (Δ's Exh. 3, p. 47).

---

[45]*See also* Deposition of Stephen Williams taken August 24, 2010 at p. 84, 107-08 (Δ's
Exh. 5); Deposition of Stephen Williams taken January 6, 2011 at pp. 136-142, 147 (reviewing
various drafts of the VSA and agreeing that they demonstrated that the liquidated damages
amount was negotiated down to $250,000.00 per occurrence)(Δ's Exh. 8); Deposition of Darren
Vorst taken September 1, 2010 at p. 67 (identifying email communications relative to the
negotiation of the liquidated damages provision down to the $250,000.00 per occurrence) (Δ's
Exh. 20).

It is undisputed that, at the time of the negotiation, there was no suggestion by International Marine that the Liquidated Damages provision in Section 11G of the VSA was unenforceable or that International Marine intended to ignore and breach the provisions of Sections 11F and 11G.   To the contrary, International Marine requested only that the Liquidated Damage amount for violation of the restrictions of use in Section 11F be lowered to $250,000 per occurrence, which was agreed to by both International Marine and Delta Towing. (Δ's Exh. 3, p. 47).

Williams of International Marine admitted that his attorney negotiating the sale never suggested that he need not worry about the liquidated damages provision because it is a penalty that is unenforceable.  He admitted that he signed the agreement and, upon the suggestion that Defendant was simply enforcing its rights under an agreement that Williams signed, he testified:

| | |
|---|---|
| Williams: | You can shove that agreement so far up you ass.  The agreement is stupid.  It should have never been agreed to. I will take responsibility for – |
| Counsel: | You can shout at me, but I didn't agree to it; you did. |
| Williams: | I don't care. |
| Counsel: | It's your name on here. |
| Williams: | You are the snake that wants to recoup off of it.[46] |

After approximately two months of negotiations, the September 8, 2006 Vessel Sales Agreement relative to to DELTA TEAM and DELTA SKIPPER was executed by Mr. Williams on behalf of International Marine. *See* VSA (Δ's Exh. 1/Rec. Doc. 67-2). With regard to Section 11F (restrictions on use), the parties agreed on the following:

F. Covenant Regarding Name/Use of Vessels/Hiring of Crews.
Buyer represents that it is purchasing the Vessels for use with

---

[46]Deposition of Stephen Williams taken on August 24, 2010 at pp. 145-146 (Δ's Exh. 5).

Buyer's owned or chartered equipment in support of Buyer's internal operations. Inasmuch, Buyer covenants and agrees that neither it or any of its affiliated companies will charter out or enter into towing contrasts or otherwise utilize or permit anyone else to utilize the Vessels for hire (collectively "Charters Out") in the inland and offshore waters of the U.S. Gulf of Mexico and the state and federal waters adjacent thereto (the "Covered Trade") for a period of five (5) years from the date of this Agreement (the "Covered Term"). Notwithstanding the foregoing, in the event Buyer or its affiliated companies wish to Charter Out either or both Vessels in the Covered Trade during all or part of the Covered Term, Buyer shall be obliged to time charter the applicable Vessels to Seller for Seller to enter into Charters Out with customers acceptable to Seller (the "Customer Charterers"). Such chartering in and chartering out shall be on essentially back-to-back terms and condition except that charter hire payable to Buyer by Seller shall be an amount equal to 90% of the gross charter hire actually received by Seller from the Customers Charterers under such Charters Out and shall be due and payable to Buyer within fifteen (15) days after receipt of such charter hire by Seller. **If Seller is unable to secure Charters Out for the Vessels within a reasonable time of the Vessels becoming available, Buyer may Charter Out either or both of the Vessels at fair market rates directly to Custom Charterers for use in the Covered Trade during all or part of the Covered Term, but Buyer shall pay to Seller as compensation therefore an amount equal to 10% of the gross charter hire actually received by Buyer from Custom Charterers under such direct Charters Out and shall be due and payable to Seller within fifteen (15) days after receipt of such charter hire by Buyer ... Buyer covenants and agrees to make the provisions of the paragraph 11F and paragraph 11G hereof a term and condition of any future sales of and Bills of Sales for the Vessels.**

VSA, ¶ 11F (emphasis added) (Δ's Exh. 1/Rec. Doc. 67-2) .

Regarding "Liquidated Damages," the parties agreed to the following:

G. <u>Liquidated Damages</u>. **The consideration for the provisions in paragraph 11F and this paragraph 11G is that the above Purchase Price is below the fair market price of the Vessels at the time of sale and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged and confessed.** In the event Buyer or its affiliated companies or any subsequent owner, manager, or charterer of the Vessels violates any of the

covenants and agreements in paragraph 11F, Buyer shall pay to Seller as **liquidated damages, and not as a penalty**, the greater of (I) the sum of **Two Hundred Fifty Thousand and no/100 ($250,000.00) per incident or occurrence** or (ii) if the applicable the gross amount of revenue earned in violation of such covenant and agreement with respect to the incident or occurrence in question....

*Id.* at Paragraph 11G (emphasis added) (Δ's Exh. 1).

The restrictions on use are clearly that: (1) generally, IM was not allowed to "charter out" the DELTA TEAM and the DELTA SKIPPER in the Gulf of Mexico for a period of five (5) years following the September 8, 2006 sale; (2) however, if IM wished to charter out the vessels, it was obligated to do so to Delta Towing who would in turn pay 90% of the gross charter hire received to International Marine within 15 days; and, (3) if Delta Towing was unable or unwilling to secure such charters, IM was permitted to charter out the vessels, but it was obligated to pay 10% of the gross charter hire to Delta Towing within 15 days.

These provisions are a true reflection of the email (written) negotiations leading up to the September 8, 2006 sale.[47]  Williams' first offer was completely rejected for the stated reason that Delta's focus at the time was "to grow the business by returning premium tugs to work in generating earnings for Delta."[48]  Williams admitted that he recognized that competition was a concern Delta's and that he had assured Delta's representative that International Marine intended to use the vessels it would purchase internally to haul its own equipment – *i.e.*, not in competition with Delta.[49]  Williams further admitted that he was aware of the fact that Delta was

---

[47]*See* Email Communications regarding negotiation of the VSA (Δ's Exh. 3 *in globo/*Rec. Doc. 67-4).

[48]*See* Deposition of Steve Williams taken August 24, 2010 at pp. 29 (Δ's Exh. 5).

[49]*Id.* at pp. 29-32, 34-35, 50-51.

more interested in chartering the boats to International Marine and Delta's concern that the boats were used internally, not crewed by Delta licensed personnel and not competing with Delta.[50] Williams agreed that negotiations commenced on July 12, 2006.  As of August 11, 2006, Delta was still insisting on a charter as opposed to a sale and, according to Williams, the deal was not moving quickly enough for IM.[51]  Williams countered Delta Towing's charter offers, insisting that it take into consideration that IM would not be competing – *i.e.*, admittedly giving assurance that IM would not be chartering the tugs out in competition with Delta and rather using the tugs to move IM's own equipment.[52]   It was only after some persistence on the part of Williams that Darren Vorst finally offered to sell pursuant to a purchase sale agreement (first draft), which Williams handed over to his attorney (Peter Rouse) for review.[53]

In the months leading up to the final vessel sale, International Marine through Williams and counsel (Mr. Rouse) was made well aware of Delta Towing's two-fold competition concerns: (1) IM poaching Delta's crews; <u>and</u> (2) chartering out the vessels in competition with Delta Towing.[54]  During the negotiations, IM's attorney Peter Rouse professed fluency with the provisions of 11F noting:

It was my understanding that for the next 5 years that should the tugs be involved

---

[50]*Id.* at pp. 34-36 (stating that he [meaning Darren Vorst of Delta] is asking me if I am interested in chartering the tugboats as opposed to buying them" but that "I [meaning IM] am more interested in the purchase than the charter" but Darren Vorst persisted in pressing for a charter and holding down potential competition in the Gulf).

[51]*Id.* at 48-49.

[52]*Id.* at 50.

[53]*Id.* at 55-56.

[54]*Id.* at 39-40.

in any jobs, other than for the International companies, that they would *first* contact your client and work through them as a broker.  If your client did not have any work available, then my client would be able to work the tugs through other companies and pay your client a commission.  As long as I am not replacing a Delta Tug, I should have no restrictions, except that I would still pay Delta a commission....

* * *

Again, what we are trying to do is make sure that I don't take jobs away from Delta....[55]

At no time during negotiations did International Marine suggest that the covenants or liquidated damages (¶¶ 11F &G) were either unenforceable or that IM was going to ignore the "chartering out" restrictions.   More particularly, the undisputed evidence shows that the liquidated damage amount for breach was substantially reduced to $250,000 per occurrence per the agreement of both International Marine and Delta Towing.[56]   Chief Operating Officer of Delta Towing, Barry Matherne, explained that Section 11(F) was fundamental and integral to Delta Towing's willingness to sell the vessels to IM and that Delta would not have sold the boats without the non-compete provision[57] and Delta would not have sold the boats for two million each, "if we would have known they was competing against us."[58]   He explained:

We had the opportunity if we would have been speaking to either charter them or – us charter them so we would have known where they was going, who was chartering, if it was someone that we wanted to charter to versus [the situation] where we'd let Steve be the customer versus us being the customer.

* * *

---

[55]*See* Email from Peter Rouse to Darren Vorst dated September 6, 2006 (Δ's Exh. 3 at p. 46 (italicized emphasis added)/Rec. Doc. 67-4).

[56]*See* VSA (Δ's Exh. 1/Rec. Doc. 67-2); *compare* Early Drafts of VSA (noting $4,000,000 and $2,000,000 as liquidated damages for breach of chartering out provisions) (Δ's Exh. 4/Rec. Doc.67-5).

[57]*See* Deposition of Barry Matherne taken on August 4, 2010 at p. 100 (Δ's Exh. 6).

[58]*Id.* at pp. 107-108.

> If the boats went to work, International was supposed to call Delta, let them know that they're sending boats out.  This is who we are working for.  Do you have a charter for them?  Okay.  If we do not get that call, as far as Delta is concerned, the boats wasn't working or was working internally.
>
> * * *
>
> So we had no reason to believe that they was out working for third parties.[59]

On September 6, 2006, Mr. Rouse sent Mr. Vorst an email confirming changes to the

proposed purchase agreement.  With regard to the Liquidated Damages provision, the email

explained:

> It is my understanding that you and Steve have discussed the penalty [meaning the amount set forth for Liquidated Damages] and it will be reduced to $250,000.00 and $50,000.00 regarding employee violations.[60]

Section 11G of the VSA is crystal clear regarding the result of breach of Section 11F's

restrictions on use.  It provides that, in the case of violation of the restrictive covenants,

International Marine was obligated to pay Delta Towing the greater of $250,000 or the gross

amount of revenue from the charter that was in violation within 30 days.  *See* VSA at § 11G (Δ's

Exh. 1).

It is undisputed that, initially, IM complied with the covenant restricting use of the

vessels and advised Delta Towing of the first chartering out of the vessels.[61]  Mr. Williams only

express concern was reducing the 10% commission on "charters out" down to 5%.[62]  He

---

[59]*Id.* at pp. 102, 104-105.

[60]*See* Email from Peter Rouse to Darren Vorst dated September 6, 2006 (regarding the "redlined version of the purchase agreement" which Steve [Williams] sent) (Δ's Exh. 3 at p. 47/Rec. Doc. 67-4).

[61]*See* Deposition of Stephen Williams taken on August 24, 2010 at pp. 92-93 (Δ's Exh. 5/Rec. Doc. 67-6).

[62]*Id.* at pp. 90-91.

admitted that the VSA was never changed.[63]  Regarding his request to reduce the commission owed Delta, Mr. Williams testified:

> I asked if they would consider taking five percent instead of ten, and he (meaning Darren Vorst) said, "Let's stick to what the contract says."[64]

It is undisputed that, shortly thereafter, International Marine stopped providing notification of "charters out" to Delta Towing.

*Anticipated Damages*

The VSA states that: "It is understood that the resultant damages of any such breach of the covenants and agreement contained in paragraph 11F would be difficult to ascertain with certainty but that the amount stipulated herein [$250,000 per occurrence] is a good faith reasonable estimate of the damages Seller would suffer."[65]  Delta maintains (as the VSA suggests in no uncertain terms) that anticipated damages include: (1) the difference between the actual purchase price and the fair market value of the vessels at the time of sale; (2) Delta Towing's potential loss of customers, business opportunities and market share if International Marine violated a covenant with charters that were unknown to Delta Towing, especially if such charters were to existing customers of Delta Towing; and (3) Delta Towing's potential actual loss of charters, which it might have secured for the vessels on which it would have earned 100% of the revenue (rather than 10%) had it not sold the vessels to International Marine, which it would not have done absent the provisions of Sections 11F and 11G.

*Valuation of the Vessels*

---

[63]*Id.* at 91.

[64]*Id.* at 90.

[65] VSA at § 11G (Δ's Exh. 1/Rec. Doc. 67-2).

22

As previously discussed at length in Section II of this order and reasons, surveys were conducted by River & Gulf on September 22, 2006, which was within two weeks of September 8, 2006 vessel sale to International Marine.[66]   The 2006 Rivers & Gulf Surveys estimated the present market value of the DELTA SKIPPER and DELTA TEAM to be $3,000,000.00 and $3,250,000.00, respectively, and estimated replacement values of $4,000,000 and $4,500,000, respectively.[67]   It is undisputed that the surveys were performed by Mr. Carl Guidry, who conducted a visual inspection of the vessels afloat on September 22, 2006.

Four years later, International Marine retained marine surveyor/appraiser, Mr. Norman Dufour, to complete a retrospective "desktop" appraisal of the fair market value of the DELTA TEAM and DELTA SKIPPER for purposes of litigation.[68]   Without ever viewing the subject vessels, he concluded that each was worth $1,260,000 million at the time of the their purchase in September of 2008.[69]

On February 11, 2008 (about 15 months after the sale), International Marine offered to sell the vessels back to Delta Towing without restrictions and with no significant improvements[70]

---

[66]See Rivers and Gulf Survey Report Nos. 06-16308 and 06-16309 dated October 6, 2006 (Δ's Exh. 7/Rec. Doc. 67-8).

[67]Id.

[68]See Expert Report of Norman Dufour dated October 28, 2010 (noting that his work is "a desktop retrospective appraisal performed without the benefit of an inspection of either vessel," and "based on a document review only")(Δ's Exh. 17).

[69]See Norman Dufour's Deposition at p. 57 (Δ's Exh. 18).

[70]Stephen Williams' Deposition taken on January 6, 2011, at p. 100 (Δ's Exh. 8).

at a price of $6.25 million.[71]   Mr. Williams admitted notifying Delta Towing in February of

2008 that he had received an offer to sell the vessels for $6.25, which was significantly more

than IM paid for them.[72]

Regarding capital improvements to the vessel post-2006 sale, Williams testified:

There was a little bit of money spent.  But they were, you know, I think – not a whole lot of money at one given time, but maybe over the course of a year, there was lots. It doesn't take much to pull a boat out of the weeds and make it look a helluva lot more valuable.  I wouldn't say any significant [improvements].[73]

*Audits Reveal Breaches of the § 11F Covenants/Restrictions*

On July 24, 2008, Delta Towing wrote International Marine noting that it believed that

there had been violations of the VSA, specifically charters agreed in violation of the provisions

of Section 11F and invoking the audit provision in the agreement.[74]  Having received no

response, on October 20, 2008, Delta wrote again invoking its audit rights.[75]

---

[71]Stephen William's Letter dated February 11, 2008 (reserving unto Delta Towing its right of first refusal, noting that IM had received a bonafide offer from a non-affiliated third party to purchase TEAM and SKIPPER for the sum of $6,250,000.00); Barry Matherne's Letter dated February 15, 2008 (reminding Williams that to the extent that the referenced purchase did not involve a purchase of substantially all of IM's assets that any such sale to a non-affiliated third party must be made subject to the convenant and restrictions in the VSA) (Δ's Exh. 10 *in globo*); Delta Towing's Letter (declining and advising of its intention not to exercise its right of first refusal under the agreement) (Δ's Exh. 11 at p. 2/Rec. Doc. 67-12)

[72]Stephen Williams' Deposition taken on August 24, 2010 at pp. 159 (Δ's Exh. 5).

[73] Stephen Williams' Deposition taken on January 6, 2011 at p. 100 (Δ's Exh. 8).

[74]Delta Towing's Letter to International Marine/Attn: Stephen Williams signed by Barry Matherne dated July 24, 2008 (Δ's Exh. 11).

[75]Delta Towing's Letter to International Marine/Attn: Stephen Williams signed by Assistant General Counsel Lawrence Uter dated October 20, 2008 (noting that, if Delta hears nothing by October 29, 2008, it will be forced to take necessary legal action to enforce its contract rights) (Δ's Exh. 11 at p. 4).

On November 20, 2008, International Marine wrote Delta Towing stating that it had discovered that "your company is owed commissions of Fifty-three Thousand Two Hundred Ninety-three and 33/100 ($53,293.33) Dollars and enclosing a check in that amount.[76]   On November 24, 2008, Delta Towing responded stating:

> Delta Towing, LLC has received an International Marine commission check for $53,293.33, but it is not clear as to how that amount was calculated.  Please advise us at your earliest convenience as to how the amount was determined and provide us with back-ups (invoices and boat logs).

> Please be advised that Delta Towing considers the amount received as partial payment of amounts determined to be due ... [and] reserves its rights to audit all applicable records to determine all additional amounts that may be due.[77]

In January 2009, Hercules Offshore, Inc. (Hercules), the new parent company of Delta Towing, conducted an audit of International Marine's use of the DELTA TEAM and the DELTA SKIPPER.   The Hercules Audit concluded that there were thirty six (36) violations of the VSA and that International Marine had earned $922,220.75 from its improper chartering of the vessels.[78]   Hercules Offshore concluded that an additional payment of $86,482 is owed Delta Towing in commissions per the contract terms - i.e., "($922,220.00 X 10 - $5,740.00 mistaken payment)."[79]

---

[76]International Marine's Certified Letter to Barry Matherne dated November 20, 2008 (Δ's Exh. 11 at pp. 5-6).

[77]Delta Towing's Certified Letter to International Marine/Attn: Joseph Guidry dated November 21, 2008 (Δ's Exh. 11 at p. 7).

[78]Hercules Offshore's Audit Report (Δ's Exh. 12).

[79]*Id.*

25

Delta Towing then prepared a table outlining International Marine's alleged breaches[80] and presented it to International Marine, who subsequently produced its own audit findings concluding that there were only 27 violations.[81]  International Marine did not produce their audit findings until August 4, 2010 at the time of Barry Matherne's deposition.

*Notice of Breaches*

On February 20, 2009 (following the Hercules Audit), counsel for Delta Towing sent International Marine and International Marine Offshore a letter noting thirty-six (36) breaches of contract by International Marine that triggered the Liquidated Damages provision and further demanding payment.[82]  On February 27, 2009, International Marine's counsel (Mr. Rouse), who had actually advised IM on the specific terms of the sales agreement, replied to Delta Towing's letter.  For the first time since vessel sale negotiations commenced, Mr. Rouse suggested that the Liquidated Damages provision he had negotiated down to a vastly reduced amount ($250,000 per occurrence down from the original $4 million) and agreed to "as liquidated damages, and not a penalty"[83] was somehow an unenforceable penalty clause, *nunc pro tunc*.[84]

*Analysis*: *The Reasonableness of Liquidated Damages*

---

[80]Delta Towing Table (prepared post-Audit detailing 36 instances of alleged breach) (Δ's Exh. 13).

[81]*See* International Marine's Audit Findings (Δ's Exh. 14).

[82]*See* Porter and Hedge's Letter dated February 20, 2009 (Δ's Exh. 16/Rec. Doc. 67-17).

[83]VSA at § 11F (Δ's Exh. 1).

[84]*See* Rouse and Blanchard Letter dated February 27, 2009 (suggesting that audit information and 10% commissions is all that Delta Towing is owed under the contract notwithstanding International Marine's admitted twenty-seven breaches of the restrictive chartering provisions) (Δ's Exh. 16 at pp. 2-3).

26

The issue to be resolved is whether the amount specified in the contract as liquidated damages is a reasonable approximation of the **anticipated** loss at the time of the contract or an unenforceable penalty.   As noted in this court's December 6, 2010 order[85] (Rec. Doc. 63), whether the subject liquidated damages is a penalty is a question of law for the court.[86]  "In contract cases, the goal of the law is to place the nonbreaching party in the same position in which it would have been without the breach, not to inflict a penalty."[87]

In this regard, the Fifth Circuit has adopted the approach of the of the Restatement (Second) of Contracts, § 356 :

> The Restatement (Second) of Contracts § 356 comment b (1979), provides a two-part test to determine if stipulated damages are a penalty. The first factor is the anticipated or actual loss caused by the breach. The amount fixed is reasonable if it approximates the actual loss that has resulted from a particular breach, even though it may not approximate the loss that might have been anticipated under other possible situations, or if the breach approximates the loss anticipated at the time of making the contract, even though it does not approximate the actual loss. *Id*. The second factor is the difficulty of proof of loss, the more flexibility is allowed in approximating the anticipated or actual harm. *Id*.[88]

Plainly, the Restatement requires the court to examine two interrelated factors.  First, the Court should determine the difficulty of proof of loss.  Second, the Court must determine whether the amount is a reasonable approximation of the actual loss **_or_**, if the amount is a reasonable approximation of the anticipated loss at the time the contract was signed.  The more

---

[85]*International Marine, L.L.C. v. Delta Towing, L.L.C.,* 2010 WL 5056004 (E. D. La. Dec. 6, 2010).

[86]*Farmers Export Co. v. M/V Georgi Prios, Etc .,* 799 F.2d 159, 162 (5th Cir.1986); *Board of Trustees v. Wood,* 799 F.2d 1106, 1007 (5th Cir. 1986).

[87]*Farmers Export Co.,* 799 F.2d at 163.

[88]*Id.* at 162 (emphasis added).

difficult it is to prove the loss the more lenient the court will be in determining whether the amount is reasonable.[89]

Plaintiffs in this case seek to invalidate the liquidated damages provision and thus bear the burden of proof that it constitutes an unenforceable penalty.[90]   The Federal Circuit explains that this "burden [of proof] is an exacting one, because when damages are uncertain or hard to measure, it naturally follows that it is difficult to conclude that a particular liquidated damages amount or rate is an unreasonable projection of what those damages might be."[91]

Because Delta Towing does not have the burden of proving the reasonableness element at trial, it need not establish reasonableness beyond peradventure to obtain summary judgment.  *See Celotex Corp.*, 477 U.S. at 323.  In order to defeat summary judgment on liquidated damages, International Marine must demonstrate the existence of a genuine issue of material fact regarding the enforceability of the clause.

This court has already set forth the primary issue in this particular case: "whether the liquidated damages provision reasonably represented the *anticipated* damages that Delta might suffer in the event of breach of the restrictive covenants set forth in Paragraph 11(F) of the subject VSA."[92]  Albeit difficult to ascertain, Delta Towing detailed its anticipated loss resulting from breach of the "chartering out" restrictions, which fell into three categories, to wit:

- The difference between the actual sale price and the fair market value of the

---

[89]*Id.*

[90]*Id.* at 162-163.

[91] *DJ Mfg. Corp. v. U.S.*, 86 F.3d 1130, 1134 (Fed.Cir.1996) (*citing* Restatement (Second) of Contracts § 356).

[92]Order and Reasons at pp.6-7 (italicized emphasis added)(Rec. Doc. 63).

vessels a the time of sale;

- Delta Towing's potential loss of customers, business opportunities and market share if International Marine violated the covenant by chartering out the vessels unbeknownst to Delta Towing, particularly if such charters were to existing customers of Delta Towing; and

- Delta Towing's potential loss of charters, which might have been secured for the vessels on which it would have earned 100% of the revenue (rather than 10%) had it not sold the vessels to International Marine.

It is undisputed that the vessels were sold for a sum of $4 million and that the VSA negotiated by IM's attorney (Mr. Rouse) signed by IM's representative (Mr. Williams) *expressly* provided that purchase price was below the "fair market value."  Evidence submitted by the parties on fair market value includes: (1) Marine Surveyor Norman Dufour's report concluding $1,260,000 for each vessel or total value of $2,520.000 and that each vessel had a replacement value of $2,700,000;[93] (2) Barry Matherne's testimony that his estimate of the value was approximately $2.5 million each;[94] (3) the September 22nd, 2006 Rivers and Gulf Surveys concluding that the fair market values of the SKIPPER and the TEAM were $3 million and $3.25 million, respectively; (4) International Marine's February 2008 offer to sell the two vessels back to Delta Towing for the sum of $6.25 million, noting that it had a bonafide offer from a non-affiliated third party for said sum;[95] and (5) 2009 Rivers and Gulf Surveys concluding that the present market values of the SKIPPER and the TEAM were $3.6 million and $3.3 million, respectively.

---

[93]Norman Dufour's Report dated October 28, 2010 (Δ's Exh. 17); Norman Dufour's Deposition taken January 7, 2011 at pp. 37 (Δ's Exh. 18).

[94]Barry Matherne's Deposition taken January 7, 2011 at pp. 3-22 (Δ's Exh. 9).

[95]International Marine's Letter dated February 11, 2008 (Δ's Exh. 10).

Addressing the parties' submissions serially, Mr. Dufour's "desktop" appraisal, admittedly based on a "document review only," further fails to account for the facts that the SKIPPER and the TEAM were rebuilt in 1998 and 1999, respectively.  He admitted that his opinion regarding fair market value – *i.e.*, each worth only $1,260,000 at the time of purchase – "is a limited summary desktop retrospective appraisal report which was done for litigation purposes."[96]  Dufour testified that, though he was aware of the fact that both SKIPPER and TEAM had a fairly extensive "rebuild" in 1998 and 1999, respectively, that information was not included or considered in his report and conclusions.[97]   Dufour further admitted that he had no recollection as to whether the purportedly "nearly identical vessel" BREAK OF DAWN, upon which his report was predicated for any validity, had been rebuilt to any extent or not.[98] Nevertheless, he agreed that a complete overhaul adds value, but that he had no way to determine what was done to SKIPPER and TEAM.[99]  Defendant characterizes the Dufour's "desktop" appraisal as "self-evidently" unreliable.  This court agrees.

Mr. Matherne's testimonial appraisal of the vessels at $2.5 million each was made cognizant of the complete rebuild of the vessels.  As to the specifics of the  rebuild of the TEAM, he testified:

---

[96]*See* Expert Report of Norman Dufour dated October 28, 2010 at p. 2.  *See also* Deposition of Norman Dufour taken on January 7, 2011 at pp. 25-28 (agreeing that "it wouldn't have hurt to do and inspection" and that an actual survey accomplished close to the time of the sale "gives you much better information about the condition of the vessel at that time") (Δ's Exh. 18).

[97]*Id.* at pp. 32-37.

[98]*Id.* at p. 42.

[99]*Id.* at p. 34.

The boat was pulled into the yard, completely rewired, stripped. Every wire in the boat was completely pulled out. All the woodwork was pulled out. The boat was completely rewired, new electronics, blasted and painted from top to bottom, overhaul engines, and then put in service.[100]

As to the SKIPPER's overhaul in 1998, Mr. Matherne testified:

The SKIPPER had an anchor in it at one time on the bow. The bow was completely replaced due to wastage of the anchor. The stern was completely replaced due to a bad part of the stern. The engines on the SKIPPER was originally built with three 99 CATS, which is in the Inland River Guide. Those engines was completely removed and reinstalled with V16 149s, which is what's I the boat now. They also had the winch and the winch engine on the back deck, which was moved against the cabin, and the inside of the boat refitted with the winch engine inside the boat, with the winch on the outside of the boat. And it was also blasted and painted and put back in service. Woodwork. So there was – as Mr. Norman [Dufour] would say, it went down to the ashtray and put back up.[101]

As to the age of the vessels impacting the valuation of the vessels, Matherne explained that as long as you keep an old boat up, you can make as much money with an old boat as you can with a new one.[102] Matherne further explained that "the market was hot at that time," "you could not get a shipyard to build them," and Delta Towing had boats available.[103] Mr. Matherne was intimately familiar with the vessels at issue, their condition and their configuration.

Defendant points out that Plaintiffs have never filed a *Daubert* motion as to Barry Matherne and the deadline for doing so has long since passed.[104] Regarding Mr. Matherne's

---

[100]Barry Matherne's Deposition at p. 188 (Δ's Exh. 9).

[101]*Id.* at p. 189.

[102]*See* Deposition of Barry Matherne taken on August 4, 2010 at p. 108 (Δ's Exh. 6).

[103]*Id.* at p. 109.

[104]*See* Delta Towing's Reply in Support of Second Motion for Summary Judgment at p. 3 (Rec. Doc. 88).

qualifications as a tugboat appraiser, the court can hardly ignore the fact that he has sold boats as a part of his job for years; additionally, within the last 5 years as a part of his job, he sold over 50 boats.[105]   Clearly, Mr. Matherne's valuations are admissible and support Delta Towing's contention that the vessels were undervalued at the time of sale as the parties specifically agreed in the context of the VSA.

The 2006 Rivers and Gulf Surveys provide this court with objective evidence of the fair market value of the vessels at the time of their sale.[106]   It is undisputed that these surveys were conducted pursuant to a "hands-on" inspections while the vessels were afloat within two weeks after their sale.   Said surveys resulted in reported findings of fair market value (FMV) appraisals of $3 million and $3.25 million for the SKIPPER and the TEAM, respectively.

The sole purpose of these independent surveys conducted by Rivers and Gulf was to provide an accurate value for International Marine's bank to ensure that it was properly collateralized for loans to International Marine.   Norman Dufour, plaintiff's expert appraiser, testified that it was his understanding that a bank commissions such a survey to determine actual market value to ensure that they are properly collateralized.[107]   Suffice it to say, Rivers and Gulf concluded that the vessels' market value was $6,250,000 – *i.e.*, $2,250,000 more than International Marine paid for them only two weeks before the surveys.   This evidence too is fully consistent with the VSA's unequivocal stipulation that the vessels were sold at less than their fair market value.

---

[105]S*ee* Barry Matherne' Deposition taken January 7, 2011 at p. 80 (Δ's Exh. 9).

[106]September 22, 2006 Rivers and Gulf Survey Nos. 06-16308 and 06-16309 (Δ's Exh. 7).

[107]*See* Deposition of Norman Dufour dated January 7, 2011 at p. 57 (Δ's Exh. 18).

Additionally and as previously noted, it is undisputed that International Marine offered to sell the vessels back to Delta Towing for the sum of $6.25 million, which is also $2.25 million more than Plaintiffs paid for the vessels fifteen months earlier.  (Δ's Exh. 10)   Most notably, there were no *significant* changes to or modifications of the vessels between the time of sale (September 8, 2006) and the International Marine's February 2008 offer.[108]

The 2009 Rivers and Gulf surveys of the vessels (Δ's Exh. 19) are admissible under Rule 803(6) as previously discussed.  They provide present market values of $3.6 and 3.3 million two years after the VSA and demonstrate the vessel were worth $2.9 million more two years after the sale and without any significant changes.

 The Vessel Sales Agreement itself states in unmistakeable terms at Section 11G that the sale price was below fair market price as part of the consideration, to wit: "The consideration for the provisions in paragraph 11F and this paragraph 11G is that **the above Purchase Price is below the fair market price of the Vessels at the time of sale** and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged and confessed."[109]

---

[108] *See* Stephen Williams' Deposition taken on August 24, 2010 at p. 165 (testifying that IM reworked the wenches, blasted and painted them) (Δ's Exh. 5); Stephen Williams' Deposition taken on January 6, 2011 at p. 100 (agreeing that, other than $51,000 spent to overhaul the engine on the SKIPPER, there were no significant improvements, no rebuild and that the boats were in the water working less than a month after the sale) (Δ's Exh. 8); Deposition of Barry Matherne at pp. 104-107 (reviewing IM's documentation regarding improvements to the vessels and noting there were no capital improvements or anything that would have extended the life of boat, just routine repairs and daily maintenance, and that there were no engine change outs, cutting the bottoms out or any stripping and rewiring the boat, etc.) (Δ's Exh. 9).

[109] VSA regarding DELTA TEAM and DELTA SKIPPER signed September 8, 2006 (emphasis added) (Δ's Exh. 1).

Mr. Williams' testimony that the aforesaid stipulation was a "joke of a statement"[110] warrants little discussion, except to say that Mr. Williams admitted that he was not a marine surveyor and would defer to Mr. Dufour on the issue of fair market value of the vessels.[111]

In *Southern Mill. Co. v. United States*, 270 F.2d 80 (5th Cir. 1959), the Fifth Circuit observed that:

> Liquidated damages are a well-known remedy, and in fact Congress has utilized this form of recovery in numerous situations. * * * Liquidated-damage provisions, when reasonable, are not to be regarded as penalties.' *Rex Trailer Co. v. United States*, 350 U.S. 148, 76 S.Ct. 219, 221, 100 L.Ed. 149.

*Id*. at p. 83.

In the case a bar, Plaintiffs were given the privilege of purchasing marine equipment (vessels) at a greatly reduced price upon the condition that it be used for restricted purposes so as not to compete with Delta Towing. The restrictions on use are clear and unmistakeable and do not, as International Marine submits, relate only to 10% commissions. The provision is a reasonable one and the measure of damages is properly related to the stipulated conditions regarding "chartering out" the vessels in competition with Delta.[112]

Turning to anticipated damages insofar as they include loss of potential of customers, business opportunities and market share, Mr. Matherne sufficiently explained the purpose of the liquidated damages provision and its amount, to wit:

---

[110]Stephen Williams' Deposition taken on August 24, 2010 at p. 154 (Δ's Exh. 5).

[111]Stephen Williams' Deposition taken on January 6, 2011 at p. 17 (Δ's Exh. 5).

[112]*See e.g., Southern Milling Co. v. United States,* 270 F.2d 80, 83 (affirming summary judgment in favor of the United States, noting that the appellant was given the privilege of purchasing a commodity at a greatly reduced price upon the condition that it be used for a restrictive purpose and finding the liquidated damage provision a reasonable one and not an unenforceable penalty).

[T]he 250,000 was for certainty of the charters because we had no idea how long or how much the charters would be, how long of a job. So when the boats were sold, all that was taken into consideration.

The 250K was for us not to have to compete against them and have the possibility of lost revenue, market share, loss of customers ... future sales.[113]

Plaintiffs mischaracterize Mr. Matherne's testimony to the extent that they suggest that he testified that he was not involved in establishing the amount of liquidated damages.[114] He actually testified that the $250,000 per occurrence amount was suggested by the attorney for TODCO and that he could not say how the attorney arrived at that figure, but that he [Matherne] "considered the amount of work that the company would be doing" and, taking into consideration the potential for lost "revenues and customers," "said that was fine."[115] Clearly, Mr. Matherne *was* involved.

Citing Mr. Matherne's testimony, International Marine also erroneously posits that Delta admits that it has no actual damages.[116] Matherne's testimony was rather to the effect that he did not know and could not say upon finding out months after the fact of breach whether Delta Towing lost any customers.[117]

Mr. Vorst also noted the difficulty in ascertaining the anticipated damages at the time of the vessel sale, testifying as follows:

The – agreement's – you know, say what it says, that the 10% could amount to

---

[113]Barry Matherne's Deposition taken August 4, 2011 pp. 63 and 81 (Δ's Exh. 6).

[114]*See* International Marine's Reply at pp. 3-4 (Rec. Doc. 90).

[115]Barry Matherne's Deposition taken August 4, 2010 at pp. 57 (Δ's Exh. 6).

[116]*See* International Marine's Reply at p. 4 (Rec. Doc. 90).

[117]Barry Matherne's Deposition taken January 7, 2011 at pp. 47-48 (Δ's Exh. 9).

$250,000, depending on the term of the charter out.[118]

International Marine argues that Mr. Vorst admitted that $250,000 was a penalty.  Plaintiffs'

contention in this regard merits little comment, considering that this is an issue of law for the

court to decided.  It is enough to say that it disregards the plain language of the VSA. In addition,

Darren Vorst testimony was more precisely that, "**in hindsight**," the $250,000 per occurrence

liquidated damage provision could be considered a penalty.  He further explained that, "when the

agreement was contemplated we [meaning Delta Towing] didn't have visibility of what charter

out terms would be entered into" and so, "yes," in hindsight there was a disparity between the

$250,000 and the range of commissions actually earned.[119]

Matherne also elaborated on this point when counsel for  International Marine inartfully

and inaccurately referred to Section 11F of the VSA as simply a "commission agreement,"

testifying:

> No.  I would not say that would be the  - - the heart of it.  The - - the heart of it is
> not knowing who is going to get the boat, what rate it's going to be, what
> customer it's going to be, future revenues.  I mean, it's - - it's not necessarily as
> easy as - - well, it's just 10% commission.  That's not what the vessel sale
> agreement that we provided was about.
>
> It was about mostly giving him the boats, letting him work them with his own
> equipment, and knowing who they was going to work for in between, where we
> had a chance if it was good Delta customer, why, we'll go ahead and bill them
> because that's one of our normal customers....
>                                        * * *
> No, we need to know who they're renting to first .... what customers, where it is
> going, how much is it for.[120]

---

[118]Darren Vorst's Deposition taken September 1, 2010 at p. 58 (Δ's Exh. 20).

[119]*Id.* at pp. 59-61.

[120]Barry Matherne's Deposition taken January 7, 2011 at pp. 29, 31(Δ's Exh. 9).

When asked, why is that so important to you," Matherne succinctly responded:

> So I don't lose any future work or any customers or any customers that I have. Again, it goes back to where ... in our line of business, if you send a boat out, they'll normally call back the boat that goes out, not the company that owns the boat.[121]

An audit long after the fact breach did not help and Mr. Matherne so testified. He stated: "finding out after the fact didn't do [Delta Towing] any good."[122]  Suffice it say, by then Delta's opportunity to charter the vessel was gone and the damage was done.

International Marine has presented no evidence suggesting that Delta Towing's concerns regarding loss of market share, future customers or future business was unreasonable or unrelated to Delta Towing's anticipated loss.  Indeed, Mr. Williams testified that he gave no thought at all to whether or not the $250,000 amount bears any relationship to Delta Towing's anticipated damages at the time of the loss.[123]  He further testified that he had no tugboats prior to the acquisition of the TEAM and the SKIPPER.[124]  Mr. Williams never owned or managed a tugboat company and, even at the time of his deposition, he only had three tugboats.[125]

Finally, as to loss of charters where Delta Towing would have received 100% of the charters less operating expenses, Mr. Matherne testified that Delta Towing would not have sold

---

[121]*Id.*at 34.

[122]*Id.* at 35.

[123]*See* Stephen Williams' Deposition taken on January 6, 2011 at p. 144-145 (testifying "not at all" and that "when it comes to the marine business, I am the smartest guy in this room" and "there are no damages") (Δ's Exh. 8);

[124]*Id.* at pp. 43-44, 46.

[125]*Id.* at pp. 20-21.

the vessels without the restrictive covenant and liquidated damages provision.[126]  Both Mssrs.

Matherne and Williams testified that there would have been plenty of work for the vessels in

2006 and 2007 on account of construction work related to the hurricanes (Katrina and Rita) and

the increase in the prices of oil and natural gas.[127]

Mr. Matherne testified that, in late 2006 and 2007, day rates in the range $7,000 for each

vessel could be anticipated in the Gulf region and charters could have been for the duration of a

year.[128]  Mr. Williams did not dispute the rate but thought it was at the high end;[129] as to duration,

he opined that charters could range from 3 hours to 3 years.[130]

The Fifth Circuit has recognized that damages resulting from covenants not to compete

are notoriously difficult to calculate.[131]  In *Blase Industries Corp.*, the Fifth Circuit explained:

> No-hire agreements and covenants not to compete often include a liquidated
> damages provision to avoid the difficulty of calculating damages. *See, e.g.*, H&M
> Commercial Driver Leasing, Inc. v. FoxValley Containers, Inc., 209 Ill.2d 52, 282
> Ill.Dec. 160, 805 N.E.2d 1177, 1184 (Ill.2004) (no-hire agreement contained
> liquidated damages clause). These provisions are valid when damages are

---

[126]Barry Matherne's Deposition taken August 4, 2010 at pp. 107-108 (noting "market value is he would'nt have sold the boats if we would have known they was competing with us"). (Δ's Exh. 6).

[127]Barry Matherne's Deposition taken January 7, 2010 at pp. 54-55 ("[W]e had to figure out what the rate was, what the market was, what it could be, best year we ever had financially, gone stronger, didn't see it going down" – "Two years after Katrina, things should be starting to pick up for that size vessels, crews.")(Δ's Exh. 9); Stephen Williams' Deposition taken January 6, 2011 at pp. 36-40, 50-51 (testifying that the hurricanes created an opportunity down the road for vessels like that to work) (Δ's Exh. 8).

[128]Barry Matherne's Deposition taken January 7, 2010 at p. 54 (Δ's Exh. 9);

[129]Stephen Williams' Deposition taken January 6, 2011 at p. 50 (Δ's Exh. 8).

[130]*Id.* at 58-59.

[131]*Blase Industries Corp. v. Anorad Corp.*, 442 F.3d 235 (5th Cir. 2006).

uncertain and the stipulated sum is reasonable. *Mayhall v. Proskowetz*, 537
S.W.2d 320, 322 (Tex.Civ.App.-Austin 1976, writ ref'd n.r.e.).[132]

The obvious purpose of the liquidated damages provision was to avoid such after the fact

calculations as International Marine has proposed.   It is pellucid on the summary judgment

record that Delta Towing's anticipated future loss on account breach and the calculation of such

damages were difficult to ascertain or quantify.  Early on, Delta Towing explained the difficulty

via hypothethical example utilizing the day rates of similar vessels in its fleet CLIPPER (2400

hp) and FACTOR (4200 hp):[133]

> Assuming that the vessel improperly chartered [for one year] ... at
> $6,500 (approximately the rate at which Delta Towing was
> chartering similar vessels in 2006), the gross amount of the charter
> hire would have been $2,372,500 ($6,500 per day X 365 days) of
> which 10% would be $237, 250, an amount similar to the actual
> liquidated damages provision in the VSA.  By the same token,
> such improper charter could have been for two years, in which
> event the liquidated damages provision limit would only provide
> Delta Towing with half this amount and would still only be one
> violation.
>
> * * *
>
> It was against such a backdrop of such hypothetical possibilities,
> which were considered by the parties at the time, that the
> liquidated damages was agreed.  Moreover such hypothetical
> calculation does not even take into account intangible losses such
> as loss of market, loss of customers or the reduced sale price....[134]

Delta Towing's position is that, at the time of the sale, it anticipated lucrative charters

---

[132]*Id.* at 238.

[133]In September 2006, Delta Towing chartered the DELTA CLIPPER (2400 hp) at $5,500
per day and DELTA FACTOR (4200 hp) at $15,000 per day).  The rates for the DELTA TEAM
and SKIPPER would have been somewhere between these rates. *See* Delta Towing's Sur-Reply
to Plaintiffs' Motion for Summary Judgment at p. 5 and n. 1 citing Barry Matherne's affidavit
appended as Exhibit A (Rec. Doc. 44-3).

[134]*Id.* at p. 4-5.

and this is corroborated by the fact that it initially refused to sell the vessels, which were stacked. The evidence is uniformly that, for well over the first month of negotiations with Stephen Williams (IM), Defendant stuck to its guns pressing for charter, all the while IM's Mr. Williams countered by pressing hard for a sale of the two vessels.  It is undisputed that throughout this period, Mr. Williams assured Delta Towing that it wanted to purchase the vessels to use with its own equipment and would not compete.

As to International Marine's argument that Delta Towing was liquidating its entire fleet of tugboats at the time of the sale and therefore could not anticipate any loss of charters,[135] there is no support in the record for that proposition.   Mr. Matherne's testimony was rather that Delta Towing was in the process of selling its 1800 class tugs, had sold all but one its 2400 class tugs and some of its 3000 class tugs for the following reasons: (1) the 2400 class tug could to the jobe of the 1800's; (2) the 4000 class tugs it was operating could do the job of the 3000's; (3) good crews were hard to find post-Katrina; (4) its customers wanted bigger boats; and (5) Delta's 4200 class tugs were working as 4200, 3600 and 3000 horsepower tugs depending on the type of job and the market.[136]  In addition, Darren Vorst testified that all of Delta Towing's stacked equipment was not officially depicted as being up for sale.[137]  Clearly, Delta Towing was not in the process of liquidating or selling off its *entire* fleet at the time of the sale.

Whether a provision is a penalty or an enforceable liquidated damages clause is determined in light of the circumstances at the time of contracting, not after the breach.  Here,

---

[135]*See* International Marine's Reply at p. 3 (Rec. Doc. 90).

[136]Barry Matherne's Deposition taken January 7, 2010 at pp. 107-130 (Δ's Exh. 9).

[137]Darren Vorst's Deposition taken September 1, 2010 at p. 34 (Δ's Exh. 20).

the circumstances present at the time of the contract did not permit prediction of the actual amount of damages with any accuracy.  Looking at the contract at the time it was made, *ex ante* breach, this court cannot bicker with the $250,000 per occurrence forecast.  Indeed, International Marine bargained for that amount of liquidated damages, which was reduced from $400,000.

Plaintiffs make much ado of Delta Towing's aggregate approximate $9 million demand; however, that figure only serves to illustrate that International Marine's breaches of the chartering out restrictions were flagrant or decadent – *i.e.*, 3 X 10 in number give or take three to six violations.[138]   Moreover, it is clear that this record does not establish any amendment of the contract or release of the restrictions imposed by Section 11F.  The evidence is uniformly to the opposite effect.  Williams' admitted that he was advised pre-breach that Delta Towing's aim was to stick to the agreement.

International Marine maintains that the decision in *Industrial Maritime Carriers, Inc. v. Holnam, Inc.*, 1991 WL 34655 (E. D. La. 1991) (Mentz, J.) compels a different result.  However, *Industrial Maritime* concerned a liquidated damages provision in a bill of lading that allowed the carrier to double the freight charges if goods were improperly declared.  There is no evidence in the case that there was any negotiations between the parties over the terms in the bill of lading prepared by the carrier.  This case involves a vessel sales agreement that was negotiated for a period of months, including the chartering out restrictions and the liquidated damages provisions for breach.  All of the provisions at issue were reviewed in detail by parties who were both represented by counsel and the liquidated damages amount was reduced and agreed to expressly.

---

[138]In the event that the court found that International Marine breached the covenant set forth in Section 11F, International Marine maintains that there were only 27 violations (Δ's Exh. 14), whereas Delta Towing's audit reported 36 violations. (Δ's Exh. 12 and 13).

None of these factors are present in *Industrial Maritime.*

This court is equally unimpressed with Plaintiffs' reliance on *Louis Dreyfus Corporation v. 27,946 Long Tons of Corn*, 830 F.2d 1321 (5ᵗʰ Cir. 1987).  In *Louis Dreyfus*, the Fifth Circuit affirmed the district court's finding that a $30,000 per day lump sum charge for a vessel's failure to vacate a dock was an unenforceable penalty.  This case involves restrictions on use or a non-compete agreement, involving anticipated damages in the case of breach which were difficult to ascertain.  Moreover, the below market purchase price agreed to by the parties reflected the restrictions on the use of the vessels and the result of any violations.  Plainly, the vessels sold at a lower price because of the covenant or chartering-out restrictions set forth in Section 11F of the VSA.  The contract that International Marine signed so stipulates.  The equities are decidedly different in this case.

Plaintiffs in this case misconstrue or ignore the primary obligation in § 11F to which the liquidated damages in § 11G relates.  While IM argues that the only obligation was to pay 10% commissions on agreed upon "charters-out," it is clear that the liquidated damages provision focuses on the primary obligation – that is, the restrictions on use or covenant not to compete.

Despite Mr. William's constant refrain that he did not read the contract before he signed it, under established contract principles, "[a]bsent fraud or mental incompetence, a person who signs a document intentionally is bound by its contents regardless of whether or not he read the document."[139]   "In this connection it has been said that one is under a duty to learn the contents of a written contract before he signs it, and that if, without being the victim of fraud, he fails to

---

[139]*Donovan v. Mercer*, 747 F.2d 304, 308 n. 4 (5th Cir.1984); *Widener v. Arco Oil & Gas Co.*, 717 F.Supp. 1211, 1215 (N. D. Tex.1989).

read the contract or otherwise learn its contents, he signs the same at this peril, and is estopped to

deny his obligation, will be conclusively presumed to know the contents of the contracts, and

must suffer the consequences of his own negligence."[140]   The United States Supreme Court has

stated:

> It will not do for a man to enter into a contract, and, when called upon to respond
> to its obligations, to say that he did not read it when he signed it, or did not know
> what it contained. If this were permitted, contracts would not be worth the paper
> on which they are written.  But such is not the law.[141]

*Conclusion*

Both parties press for summary judgment in this matter as to the enforceability of the

bargain for liquidated damages provision.   In fact, this is the second "go round" for both parties

and the submissions are legion.  Nevertheless, there are no genuine issues of material fact as to

the enforceability of the liquidated damages provision against IM.

Section 11F of the VSA was never just a "commission agreement."   Delta Towing has

established the enforceability of the liquidated damages in Section 11G because, at the time of

the VSA, the amount fixed ($250,000 per occurrence) was a reasonable forecast of just

compensation for the harm caused by potential multiple breaches, damages which are as difficult

to estimate or calculate both before and after-the-fact of breach.  Patently, it was the intent of the

---

[140]17 C.J.S., Contracts, 137, pp. 489-490.

[141]*Upton v. Tribilcock*, 91 U.S. 45, 23 L.Ed. 203 (1875).

parties to provide for liquidated damage and not a penalty.  Delta Towing bargained for the chartering restrictions to protect itself from loss of market share, loss of its customers, potential loss future customers and loss of 100% commission on charters.   Liquidated damages at the lower amount agreed amount of $250,000 was the *quid pro quo*.  Any other measure of damages in this case would be difficult if not impossible to ascertain, because it would involve speculative efforts to measure loss of market share, customers, future customers and charters-out by Delta Towing.  Finally, the covenants and liquidated damages for breach of same were not only part of the consideration for the VSA, but were also an important factor in the stipulated below market purchase price of $4,000,000.00 for both vessels.

The parties were at all pertinent times of equal bargaining power.  This court is not inclined to gut the parties' deal and transform it into a mere commission agreement because, in *hindsight* and under these particular facts involving at least 27 breaches, it now appears from International Marine's perspective that it made a bad bargain.

In sum, International Marine has failed to come forward with a scintilla of competent evidence that the amount stipulated as Liquidated Damages was not a good faith effort to ascertain Delta Towing's anticipated damages in the event of breach by International Marine.

Accordingly;

**IT IS ORDERED** that:

(1)     Plaintiffs' Motion for Leave to File Amended Witness List (Rec. Doc. 69) is DENIED;

(2)     Defendant's  Second Motion for Summary Judgment (Doc. No. 67) is GRANTED IN PART as to liability for liquidated damages; and

(3)     Plaintiff's Motion for Leave to File Supplement to Motion for

Summary Judgment and to Reconsider Summary Judgment (Doc.
No. 72) is DENIED.

New Orleans, Louisiana, this 11th day of March, 2011.

A. J. McNAMARA
UNITED STATES DISTRICT JUDGE