UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| INTERNATIONAL MARINE, L.L.C., AND INTERNATIONAL OFFSHORE SERVICES, L.L.C. | § § § § | |
| *Plaintiffs/ Counter-defendants,* | § § § | |
| v. | § § § | |
| FDT LLC F/K/A DELTA TOWING, L.L.C. | § § | |
| *Defendants/ Counter-plaintiffs,* | § § § | CIVIL ACTION NO. 10-CV-00044 |
| INTERNATIONAL MARINE, L.L.C. AND INTERNATIONAL OFFSHORE SERVICES, L.L.C. | § § § | DISTRICT JUDGE ELDON E. FALLON MAGISTRATE JUDGE WILKINSON |
| *Third-Party Plaintiffs,* | § § § § | |
| v. | § § | |
| STEPHEN M. VALDES | § § | |
| *Third-Party Defendant.* | § § | |

---

**INTERNATIONAL'S POST-TRIAL BRIEF**

---

# TABLE OF CONTENTS

Introduction ...................................................................................................................... 1

Proposed Findings of Fact ................................................................................................ 2

Argument ........................................................................................................................ 12

    I.    International Did Not Breach The Use Restrictions In The Vessel Sales Agreement ........................................................................................................ 12

        A.    No Court Has Determined Whether International Breached the Vessel Sales Agreement ................................................................... 12

        B.    The Court Should Strictly Construe The Use Restrictions ..................... 13

        C.    International Complied With The Use Restrictions ................................. 14

    II.    If International Breached The Use Restrictions, This Is An "Extreme Case" Making Liquidated Damages Inappropriate ................................................ 18

    III.    Delta Towing Has Grossly Inflated the Number of "Incidents or Occurrences." ...................................................................................................... 21

        A.    Late And Incorrect Payments Do Not Implicate The Liquidated Damages Provisions Of The Vessel Sales Agreement. ........................... 21

        B.    If The Court Applies The Liquidated Damages Provision, There Was Only One "Incident or Occurrence." ................................................ 23

        C.    The Charters To United Tugs And Smith Marine Did Not Violate The Use Restrictions, Much Less Violate Them 28 Times. ..................... 24

        D.    The Admissions That the Number of Charters Cannot Be Determined From the Documents in the Record Are Binding on Delta Towing ......................................................................................... 28

    IV.    Delta Towing Is Not Entitled to Pre-Judgment Interest on Liquidated Damages ............................................................................................................. 28

    V.    Delta Towing Did Not Give International the Opportunity to Cure Required by the Parent Company Guaranty ......................................................... 29

Conclusion ...................................................................................................................... 29

i

## TABLE OF AUTHORITIES

**Cases**          **Page(s)**

Checkers Eight Ltd. P'ship v. Hawkins,
     241 F.3d 558 (7th Cir. 2001) ....................................................................22

Colonial at Lynnfield, Inc. v. Sloan,
     870 F.2d 761 (1st Cir. 1989) .....................................................................19

Condrey v. Suntrust Bank of Ga.,
     429 F.3d 556 (5th Cir. 2005) .....................................................................14

Dallas-Fort Worth Regional Airport Bd. v. Combustion Equip. Assocs., Inc.,
     623 F.2d 1032 (5th Cir. 1980) ...................................................................17

Farmers Export Co. v. M/V Georgis Prois,
     799 F.2d 159 (5th Cir. 1986) .....................................................................24

Graham v. Lieber
     (La. App. 2 Cir. 9/27/66) ..........................................................................13

Hyde v. Stanley Tools,
     107 F. Supp. 2d 992 (E.D. La. 2000), aff'd 31 Fed. Appx. 151 (5th Cir. 2001)
     (per curiam).........................................................................................26, 28

International Marine, L.L.C. v. Delta Towing, L.L.C.,
     704 F.3d 350 (5th Cir. 2013) .....................................................................19

Marine Transp. Servs. Sea-Barge Group, Inc. v. Python High Performance Marine
     Corp., 16 F.3d 1133 (11th Cir. 1994) ..................................................17, 18

McKeithen v. The S.S. Frosta,
     430 F. Supp. 899 (E.D. La. 1977)..............................................................23

Michaels v. Mutual Marine Office, Inc.,
     472 F. Supp. 26 (S.D.N.Y. 1979) ..............................................................24

Miller v. Nissan Motor Acceptance Corp.,
     No. 99-4953, 2000 U.S. Dist. LEXIS 15645 (E.D. Pa. Oct. 27, 2000) .................19

Montelongo v. Meese,
     803 F.2d 1341 (5th Cir. 1986) ...................................................................28

Northwest Acceptance Corp. v. Heinicke Instruments Co.,
     441 F.2d 887 (5th Cir. 1971) .....................................................................16

Oxford Shipping Co., Ltd. v. N.H. Trading Corp.,
    697 F.2d 1 (1st Cir. 1982) ...........................................................................................17

Pickren v. United States,
    378 F.2d 595 (5th Cir. 1967) .......................................................................................16

Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.,
    601 F.3d 1159 (5th Cir. 2010) ....................................................................................17

Tidewater Inc. v. United States,
    565 F.3d 299 (5th Cir. 2009) .......................................................................................15

Trans-Asiatic Oil Ltd., S.S. v. Apex Oil Co.,
    804 F.2d 773 (1st Cir. 1986) .......................................................................................19

Transport Ins. Co. v. Lee Way Motor Freight, Inc.,
    487 F. Supp. 1325 (N.D. Tex. 1980) ..........................................................................24

Uniroyal, Inc. v. Home Ins. Co.,
    707 F. Supp. 1368 (E.D.N.Y. 1988) ...........................................................................23

United Air Lines, Inc. v. Austin Travel Corp.,
    867 F.2d 737 (2d Cir. 1989).........................................................................................21

United States v. Taylor,
    166 F.R.D. 356 (M.D.N.C. 1996) ..........................................................................26, 28

Wilson v. M/V B911,
    No. 10-3320, 2012 U.S. Dist. LEXIS 19348 (E.D. La. Feb. 16, 2012) ....................17

**Statutes**

La. C.C. art. 1993.........................................................................................................29

La. C.C. art. 2053.........................................................................................................16

La. C.C. art. 2057.........................................................................................................13

**Other Authorities**

22 AM. JUR. 2d, Contracts, § 522 (2d ed. 2003) ..........................................................22

11-58 CORBIN ON CONTRACTS § 58.14 (rev. ed. 2013)................................................21

11-58 CORBIN ON CONTRACTS § 58.13 (rev. ed. 2013)................................................22

RESTATEMENT (SECOND) OF CONTRACTS § 356, cmt. b ...............................................19

24 WILLISTON ON CONTRACTS § 65:34 (4th ed. 2002)................................................17

4843-3004-4951.3

24 WILLISTON ON CONTRACTS § 65:33 (4th ed. 2002) ................................................................19

Fed. R. Civ. P. 30(b)(6)..........................................................................................................12, 26

iv

**Introduction**

FDT LLC, formerly known as Delta Towing L.L.C. ("Delta Towing"), evidently thinks that it has won the lottery. Delta Towing begins by claiming that it need not prove that International Marine, L.L.C. ("International Marine") and International Offshore Services, L.L.C. ("International Offshore") (together, "International") actually breached the Vessel Sales Agreement, dated September 8, 2006 ("Vessel Sales Agreement"), because of "past rulings in this case by this District Court and the Fifth Circuit" on a separate issue—"the enforceability of the liquidated damages provision." (Delta Towing, L.L.C.'s Post-Trial Memorandum, Dkt. 328, at 1) Delta Towing either conveniently forgets or ignores that this Court expressly defined the issues for trial as "whether there was a breach or if so, how many times a breach occurred and what are the result[ing] damages, if any." (Trial Tr., 11:17-19[1])

Next, Delta Towing makes an eight-figure damages claim although it admittedly did not suffer any actual damages. Not surprisingly, Delta Towing substantially overreaches to generate this gigantic damages claim—for example, seeking:

- $250,000 in liquidated damages for a commissions payment that was $105 less than Delta Towing claims that it should have been ("Summary of International's ¶11F Breaches" ("Delta Demonstrative") at line 5);

- $500,000 in liquidated damages for two commissions payments that Delta Towing claims were 19 days late (Delta Demonstrative at lines 3-4);

- Nearly $600,000 in liquidated damages because Delta Towing claims that International paid the incorrect amount on one of a series of monthly commissions payments—even though International paid the amount invoiced by Delta Towing (Delta Demonstrative at line 1; Joint Ex. 4, at 006);

---

[1]   References to "Trial Tr." indicate the transcript of the two-day trial held on December 16-17, 2013. The parenthetical indicates which witness was testifying.  References to "_____ Dep." indicate the deposition testimony of a particular witness whose deposition testimony was designated by the parties as trial evidence. References to "Joint Ex." indicate Joint Trial Exhibits 1-76 which were admitted into evidence at trial. (Trial Tr., 34:16-35:1)

- $1 million in liquidated damages for the continued, uninterrupted use of one vessel by one client across a period of several days, claiming four separate occurrences because four invoices were issued for the convenience of the customer (Delta Demonstrative at lines 9-11, 13);

- Nearly $4 million in prejudgment interest (compounded daily) despite settled Fifth Circuit law that an interest award is not appropriate on liquidated (as opposed to actual) damages.

Unfortunately for Delta Towing, Santa Claus did not draft the maritime law or the law of damages. The evidence at trial showed that International complied with plain and unambiguous terms of the use restrictions contained in the Vessel Sales Agreement, although International failed to make some payments as a result of a change in its personnel. To the extent that International did not strictly comply with the use restrictions (which International denies), Delta Towing waived and is estopped from requiring strict compliance.

As to damages, the Fifth Circuit expressly left open the issue of whether this was an "extreme case" where the application of liquidated damages was inappropriate. The evidence at trial showed that this in fact is an "extreme case" because Delta Towing admittedly did not suffer any actual damages. International's late or incorrect payments do not implicate the liquidated damages provisions. Finally, Delta Towing has grossly overstated the number of "incidents or occurrences" resulting in liquidated damages. To the extent that Delta Towing proves that International violated the use restrictions (which International denies), the evidence at trial showed that there is only one "incident or occurrence."

## **Proposed Findings of Fact**

**The Parties**

1.     Delta Towing is a Delaware limited liability company with its principal place of business in Houma, Louisiana. It is a wholly owned subsidiary of Hercules Offshore, Inc. ("Hercules"). On May 13, 2011, Delta and Hercules entered into an asset purchase agreement

2

with Crosby Marine Transportation, LLC ("Crosby"), by which Delta Towing sold to Crosby substantially all of Delta Towing's assets and certain liabilities. (Pretrial Order, ¶ 3)

2.    International Offshore and International Marine are limited liability companies both duly organized and existing under the laws of the State of Louisiana, and both of which maintain their principal places of business in New Orleans, Louisiana. International Offshore and International Marine have sold all of their vessels and, at the time of trial, operated with only a single employee and were in the process of winding down their operations. (Id.)

3.    Valdes is an individual domiciled within the Eastern District of Louisiana. (Id.)

**The Vessel Sales Agreement**

4.    Pursuant to the Vessel Sales Agreement, International Marine purchased and Delta Towing sold the M/V Delta Team and M/V Delta Skipper at a total purchase price of $4 million. (Joint Ex. 39)

5.    Delta Towing had "cold stacked" the Team and Skipper from 2001 until the time of the sale. (Trial Tr., 108:8-21 (Matherne)) The term "stacked" means that the vessel did not have a crew and were not available for work—they were essentially shut down. (Id., 106:20-22) "Cold stacked" means that the company had no intention of putting the vessels back to work in the near future. (Id., 107:4-7) The Team and Skipper were not generating any revenue for Delta Towing. (Id., 106:18-25) Delta Towing was in the process of selling off a large portion of its tug boat fleet at the time. (Id., 109:14-16)

6.    The Vessel Sales Agreement included certain use restrictions on the vessels, but did not prohibit all competition by International (Id., 113:4-8) Under the terms of the Vessel Sales Agreement, if International wanted to charter the vessels to third parties, it had to offer Delta Towing a time charter so that Delta Towing could charter the vessel to its own customers. (Joint Ex. 39, ¶ 11F) If Delta Towing could not obtain charters within a reasonable time,

3

International could charter the vessels directly to its customers, but would owe Delta Towing 10 percent of the charter. (Id.) Paragraph 11F of the Vessel Sales Agreement provides in its entirety (underlining added):

> **Covenant Regarding Name/Use of Vessels/Hiring of Crews.** Buyer covenants and agrees to change the name of the Vessels promptly following Closing. Buyer represents that it is purchasing the Vessels for use with Buyer's owned or chartered equipment in support of Buyer's internal operations. Inasmuch, Buyer covenants and agrees that neither it nor any of its affiliated companies will charter out or enter into towing contracts or otherwise utilize or permit anyone else to utilize the Vessels for hire (collectively "Charters Out") in the inland and offshore waters of the U.S. Gulf of Mexico and the state and federal waters adjacent thereto (the "Covered Trade") for a period of five (5) years from the date of this Agreement (the "Covered Term"). <u>Notwithstanding the foregoing, in the event Buyer or its affiliated companies wish to Charter Out either or both of the Vessels in the Covered Trade during all or part of the Covered Term, Buyer shall be obligated to time charter the applicable Vessels to Seller for Seller to enter into Charters Out with customers acceptable to Seller (the "Customer Charterers")</u>. Such chartering in and chartering out shall be on essentially back-to-back terms and conditions except that charter hire payable to Buyer by Seller shall be an amount equal to 90% of the gross charter hire actually received by Seller from the Customer Charterers under such Charters Out and shall be due and payable to Buyer within fifteen (15) days after receipt of such charter hire by Seller. <u>If Seller is unable to secure Charters Out for the Vessels within a reasonable time of the Vessels becoming available, Buyer may Charter Out either or both of the Vessels at fair market rates directly to Customer Charterers for use in the Covered Trade during all or part of the Covered Term,</u> but Buyer shall pay to Seller as compensation therefore an amount equal to 10% of the gross charter hire actually received by Buyer from the Customer Charterers under such direct Charters Out and shall be due and payable to Seller within fifteen (15) days after receipt of such charter hire by Buyer. The charter hire rate charged and duration of all Charters Out shall be reasonably agreeable to both Buyer and Seller. Buyer and Seller covenant and agree that the other party shall have the right on reasonable notice, during or after the Covered Term, to audit the Buyer's and Seller's books and records to verify the amount and dates of receipt of such charter here by Buyer or Seller as applicable. (Id.)

7.   The parties added the provision allowing Charters Out by International at International's request because the barges for which International Marine had purchased the vessels were still under construction at the time of the sale. (Trial Tr., 113:12-20 (Matherne)) The purpose behind the provision was to allow both International Marine and Delta Towing to

4

earn money from time chartering the vessels until International's barges came online. (Id., 114:21-24) Delta Towing viewed this as a concession to International. (Id., 115:7-19) Delta Towing understood that, as a result of this concession, boats could compete in the marketplace under the conditions stated. (Id., 115:20-24)

8.      The Vessel Sales Agreement also included a liquidated damages provision for violations of the use restrictions contained in ¶ 11F. Paragraph 11G of the Vessel Sales Agreement provides, in pertinent part (underlining added):

> In the event Buyer or its affiliated companies or any subsequent owner, manager, or charterer of the Vessels violates any of the covenants and agreements in paragraph 11F, Buyer shall pay to Seller as liquidated damages, and not as a penalty, the greater of (i) the sum of Two Hundred fifty Thousand and no/100 Dollars ($250.000.00) <u>per incident or occurrence</u> or (ii) if applicable the gross amount of revenue earned in violation of such covenant and agreement with respect to the incident or occurrence in question …. (Joint Ex. 39, ¶ 11G)

**International Marine Complies with the Vessel Sales Agreement**

9.      On September 19, 2006, approximately 11 days after the parties signed the Vessel Sales Agreement, International informed Delta Towing's General Manager Barry Matherne ("Matherne") by email that one of the vessels, the Team, was available for Delta Towing to time charter. (Joint Ex. 41; Trial Tr., 128:4-25 (Matherne))

10.      On October 3, 2006, International's Chief Executive Officer Stephen Williams ("Williams") sent Matherne and Delta Towing's Assistant Operations Manager Ricky Guy ("Guy") an e-mail informing Delta Towing that the other vessel, the "Skipper," was available for Delta Towing to time charter. (Joint Ex. 46; Trial Tr., 129:4-19 (Matherne); 197:4-19 (Guy))

11.      Delta Towing did not seek to time charter, and in fact did not time charter, either of the vessels at any time. (Trial Tr., 130:2-9, 151:17-24 (Matherne)) Delta Towing instead put the vessels on the bottom of its "availability list." (Id., 59:8-13) As Delta Towing's General Manager at the time admitted, if a customer called with a job, Delta Towing would use its own

5

"boats first before we call anybody else to do the job for that." (Id., 59:11-13, 152:1-3) "That way," Delta Towing could "get 100 percent of the income versus 10 percent of the income." (Id., 59:24-60:1; 130:15-19) Delta Towing "really didn't try and market those two boats, unless we would have a need for them." (Id., 60:1-3) The Team and the Skipper remained on Delta Towing's "availability list" until International let Delta Towing know they were unavailable. (Id., 61:20-62:3) There is no evidence that International ever let Delta Towing know that the vessels were unavailable.

12.    Perhaps as a result of its lack of effort, Delta Towing was "unable to secure Charters Out for the Vessels within a reasonable time of the Vessels becoming available." (Joint Ex. 39, ¶ 11F) Delta Towing in fact never obtained any charters for either vessel after the sale. (Trial Tr., 130:2-6 (Matherne)) Under the terms of the Vessel Sales Agreement, International therefore could "Charter Out either or both of the Vessels at fair market rates directly to Customer Charterers for use in the Covered Trade during all or part of the Covered Term." (Joint Ex. 39, ¶ 11F) This was consistent with the parties' business understanding—Matherne testified that he understood that if International made the boats available to Delta Towing and Delta Towing did not charter them, International could charter the vessels. (Trial Tr., 126:10-13)

**Delta Towing Tells International "Don't Pass Up Any Work"**

13.    Shortly after International informed Delta Towing about the availability of the Skipper, Delta Towing confirmed that International could Charter Out the vessels directly to customers. On October 5, 2006, two days after International had informed about the availability of the Skipper, International e-mailed Delta Towing's Assistant Operations Manager Guy about a potential 6 day job. (Joint Ex. 49) International's e-mail did not include the identity of the potential customer or the proposed charter rate for the job. (Id.)

14.     Guy did not ask for information about the identity of the potential customer or the proposed charter rate. Guy rather told International: "If you have a job take it don't pass <u>any</u> <u>work</u> up just let me know a start time and a rate thanks." (Joint Ex. 49 (emphasis supplied)) As Guy admitted, there is "nothing" in his e-mail that should have alerted International that his instructions were only for the job about which International had inquired.  (Trial Tr., 230:3-11) Guy never told anyone at International that the instructions in his e-mail related only to the one job. (<u>Id.</u>, 201:17-202:2)

15.     Delta Towing's General Manager Matherne was sitting in Guy's office when he sent this response, and Matherne authorized the response. (Trial Tr. 152:18-25 (Matherne); 200:3-9 (Guy)) Matherne handled all of the day-to-day operations of running Delta Towing at the time. (<u>Id.</u>, 40:13-17) No one knew more about the administration of the Vessel Sales Agreement than Matherne. (<u>Id.</u>, 42:6-8)

16.     After the October 5 e-mail, consistent with the instructions in that e-mail, Delta Towing and International operated for months with International chartering out the vessels directly to customers without first notifying Delta Towing and informing Delta Towing about the charter, the start time and the rates after the fact. (Joint Ex. 51, 52, 54)

17.     For example, four days later, on October 9, 2006, International's Marine Logistics Coordinator Brian Chiasson ("Chiasson") e-mailed Guy to let him know that that International had chartered out the Skipper. (Joint Ex. 50) As Guy had requested in his October 5 e-mail, Chiasson let Guy know the start time and the rates after-the-fact. (<u>Id.</u>) Chiasson did not identify the customer. (<u>Id.</u>) No one from Delta Towing complained.

18.     On January 23, 2007, Chiasson e-mailed Guy after-the-fact about several jobs that had taken place in December 2006.[2] (Joint Ex. 52; Trial Tr., 207:2-16 (Guy)) Chiasson let Guy know about the duration and the rate for the jobs, but not the customers. (Id.) No one from Delta Towing complained. (Id., 205:24-208:23) Guy testified that Chiasson was acting consistent with Guy's instructions in his October 5 e-mail.[3] (Id., 209:11-210:7)

19.     On February 13, 2007, Guy's boss, Danny Talbot ("Talbot"), asked Guy whether Chiasson had mentioned any jobs for January 2007 after-the-fact when Guy had spoken with Chiasson earlier that day. (Joint Ex. 53) On March 2, 2007, Chiasson told Talbot that there were no jobs for the previous month.[4] (Joint Ex. 54) Talbot's e-mails show that he did not expect International to notify about any Charters Out until after-the-fact.

20.     Until Delta Towing's lawyers became involved almost two years later, no one from Delta Towing ever objected to International informing it about charters only after-the-fact, asked for additional information about the identity of customers or charter rates, claimed that International was violating the use restrictions in the Vessel Sales Agreement, or instructed International to follow some other procedure. (Trial Tr., 202:24-203:1, 203:18-21, 207:20-208:12, 210:10-13, 210:25-211:5, 212:22-25, 214:3-12 (Guy))

---

[2]   Delta Towing states that "the evidence is undisputed that, after November 20, 2006, International continued to charter out the Vessels in violation of ¶11F, without notifying or paying Delta Towing at all ...." (Dkt. 328, at 9) This is incorrect. International continued to provide notification (although with some mistakes) to Delta Towing in the first quarter of 2007 until Chiasson left the Company. (Joint Ex. 52-54)

[3]   Guy tried to change his testimony at trial from the testimony that he had given under oath at his deposition. The Court should credit his deposition testimony rather that the testimony he gave at trial after preparing with Delta Towing's lawyers.

[4]   Delta Towing claims that Chiasson committed "a clear and purposeful violation of ¶11F" by failing to advise Talbot in this e-mail of a two-day charter to Apache Corporation on February 8-10, 2007. (Dkt. 328, at 9) Delta Towing, however, did not present any evidence that Chiasson knew about the Apache charter or that Chiasson's failure was the result of anything other than an honest mistake, caused by his imminent departure.

**International Changes Logistics Coordinators**

21.     Sometime in early 2007, Chiasson left International and Joseph Guidry took over his job. (Trial Tr., 243:1-5 (Valdes)) At around the same time, International acquired a barge (not one of the two barges for which International had purchased the vessels from Delta Towing) along with 30 to 40 employees. Because of the change in personnel and the substantial work load generated by the new barge and employees, International missed making payments to Delta Towing. This was a mistake or oversight, rather than some purposeful decision. (Id., 244:19-245)

22.     The two barges for which International had purchased the tug boats finally came on line around July 2007. (Trial Tr., 246:11-17) Consistent with the parties' unwritten understanding, it is undisputed that International did not charter out either of the vessels to third parties once the barges came on line. (Joint Ex. 60; Trial Tr., 153:11-14 (Matherne); 246:18-20 (Valdes); Taylor Dep., 65:2-11)

23.     On July 24, 2008, more than a year after the last charter to a third party by International, Delta Towing invoked its right to conduct an audit of International's records. (Joint Ex. 56) Although Delta Towing claimed that it had information that the vessels "have been chartered to unrelated companies without this knowledge being provided to Delta Towing," Delta Towing did not make mention of liquidated damages. (Id.)

24.     After Delta Towing's letter, International conducted a self-audit. (Trial Tr., 274:24-275:12 (Valdes)) This self-audit determined that, because of the change in personnel handling marine operations with Chiasson's departure, International had missed payments and owed additional commissions to Delta Towing. (Trial Tr., 138:23-139:8 (Matherne)) On November 20, 2008, Guidry, International Marine's "new in-house broker," sent a check in the amount of $52,293.33 to Delta Towing. (Joint Ex. 58)

9

25.     Four days later, on November 24, 2008, Delta Towing sent a letter to International requesting information as to how International calculated the amount due, along with supporting information. Delta Towing stated that it viewed the $52,293.33 as "partial payment," but once again did not mention liquidated damages.  (Joint Ex. 59)

**The Audit**

26.     In January 2009, Delta Towing's parent, Hercules, audited International Marine's books and records. (Trial Tr., 142:1-5 (Matherne); 247:9-10 (Valdes)) Matherne and Hercules instructed the auditor (Nacy Mille) to determine the amount of commissions owed at the rate of 10 percent of the gross charter amount and to substantiate the $52,293.33 payment from International, not to determine the number of "incidents or occurrences" for which liquidated damages were due. (Trial Tr., 143:20-144:2, 148:17-24; 149:13-150:12 (Matherne); Mille Dep., 29:19-30:11, 46:10-47:7) The audit in fact did not determine the number of "incidents or occurrences" under the Vessel Sales Agreement. (Taylor Dep., 60:18-61:6, 61:18-23, 64:3-5; Trial Tr., 149:17-20 (Matherne))

27.     The audit concluded that International owed $86,482 in additional commissions (including the $53,293 already paid). (Joint Ex. 60; Trial Tr., 148-17-24, 150:16-19 (Matherne); Mille Dep., 37:3-10, 64:14-19, 65:9-14, 70:10-17) The audit does not make any mention of liquidated damages. (Joint Ex. 60)

28.     After Delta Towing's audit, Valdes discovered errors in the audit, but also determined that International owed additional commissions to Delta Towing. (Joint Ex. 65; Trial Tr., 248:25-249:12 (Valdes)) On February 20, 2009, International sent Delta Towing a check for $37,657 in commissions. (Joint Ex. 62; Trial Tr., 157:1-158:4 (Matherne); 249:16-25 (Valdes)) Together with the $53,293 previously sent to Delta Towing, International tendered $90,950 to

10

Delta Towing—more than the $86,482 determined to be owed in the Hercules audit. (Trial Tr., 148:17-24 (Matherne); 254:22-255:1 (Valdes); Joint Ex. 60)

29.     When International tendered these payments after International's self-audit and Delta Towing's audit, Delta Towing's General Manager believed that the matter had been "completely resolved." (Trial Tr., 160:19-25 (Matherne)) Only after Delta Towing's lawyers became involved did Delta Towing make any mention of liquidated damages. (Id. 154:16-18)

**No Actual Damages**

30.     Delta Towing did not suffer any actual damages as a result of the International charters at issue in this lawsuit—it never lost any customers, profits or potential charters as the result of International's charters. (Id., 161:17-162:4; Vorst Dep., 55:13-20).

**International's Chartering Practices**

31.     In 2006 and 2007, time charters out to customers could last up to few years, and it was not uncommon for a charter to last for months at a time. (Trial Tr., 133:9-134:7 (Matherne))

32.     International had master time charter agreements in place with all of its customers in 2006 and 2007. (Trial Tr., 233:17-23 (Valdes)) These master time charter agreements outlined the terms of International's relationships with its customers. (Id., 233:24-234:11 (Valdes); 38:10-16 (Matherne)) The parties entered into short-form charters, which detailed the locations and time-frames for specific jobs. (Id., 235:1-22 (Valdes)) Both Smith Marine and United Tugs were existing customers of International in 2006 and 2007. (Id., 234:22-25)

33.     International generally sent a single invoice for all work done by a vessel within a given month, regardless of how many jobs the vessel worked. (Id., 237:11-23) However, customers sometimes requested that International issue separate invoices for particular jobs, and International agreed to do so for the customer's convenience.. (Id., 237:24-238:7) As a result, each invoice does not equate to a charter. (Id., 302:6-15)

11

**Charters to United Tugs and Smith Marine**

34.     International chartered both the Team and the Skipper to United Tugs starting on September 24, 2006. (Joint Exs. 1-4) Delta Towing began chartering out the vessels to Smith Marine on October 8, 2006. (Joint Ex. 5) Delta Towing knew that International was chartering out to United Tugs and Smith Marine, and did not raise any issue. (Trial Tr., 49:19-22, 50:25-51:4, 130:15-19, 156:10-25 (Matherne); 194:6-16 (Guy))

35.     Delta Towing admitted through the testimony of its Rule 30(b)(6) representative that Delta Towing does not know whether each separate invoice or job number constituted a separate "incident or occurrence." (Taylor Dep., 168:20-169:10, 173:13-174:14, 177:16-23) Delta Towing further admitted that it has no reason to believe that separate invoices or job numbers indicate the existence of separate charters for the vessels, and it cannot determine whether the invoices were for related work or for different work. (Id., 107:16-109:23, 112:21-113:9, 116:16-117:15, 118:13-23, 119:9-22, 121:2-18) As the corporate representative explained, "I don't know anything about the charters. We didn't have charter agreements. So we just split them up vessel by vessel." (Id., at 90:6-8)

**Argument**

**I.     International Did Not Breach The Use Restrictions In The Vessel Sales Agreement.**

      **A.     No Court Has Determined Whether International Breached the Vessel Sales Agreement.**

At the beginning of the trial, the Court defined the issues for trial as "whether there was a breach or if so, how many times a breach occurred and what are the result[ing] damages, if any." (Trial Tr., 11:17-19) This echoed the Court's decision certifying its judgment on enforceability of the liquidated damages provision for appeal. (Dkt. 163) The Court explained that the enforceability of liquidated damages was "separate" from whether International breached the

12

contract "at least in the sense that International could succeed on one issue but lose on the other" and that "the facts relevant to the negotiation of the liquidated damages provision do not substantially overlap with the facts relevant to whether, in the course or performance, International breached the chartering provisions."[5] (Dkt. 163, at 6) The Court confirmed that ruling again before trial in denying Delta Towing's motion in limine. (Dkt. 305)

Delta Towing pretends that the Court never made any of these rulings. Delta Towing claims that this was only a "trial on the damages" and that "this trial only concerned how many times International beached" the Vessel Sales Agreement. (Dkt. 328, at 1) Perhaps Delta Towing takes this position because it cannot prove any breaches. In any event, the Court should adhere to its past decisions and statements and determine "whether there was a breach or if so, how many times a breach occurred and what are the result[ing] damages, if any."

**B.   The Court Should Strictly Construe The Use Restrictions.**

In its Pre-Trial Brief, International explained that Louisiana law requires a court strictly to construe liquidated damages clauses, Graham v. Lieber, (La. App. 2 Cir. 9/27/66); 191 So.2d 204, 207, and strictly to construe the Vessel Sales Agreement against Delta Towing as the party to whom an obligation was owed. La. C.C. art. 2057 ("In case of doubt that cannot be otherwise resolved, a contract must be interpreted against the obligee and in favor of the obligor of a

---

[5]    Delta Towing has admitted that its audit did not (and was not intended) to determine the number of incidents or occurrences subject to liquidated damages. (Trial Tr., 143:20-144:2, 148:17-24; 149:13-150:12 (Matherne); Mille Dep., 29:19-30:11, 46:10-47:7) Delta Towing itself has changed its position, claiming 37 (Taylor Dep., 182:24-183:6) and then 33 breaches (Trial Tr., 12:21-22). Likewise, International has not admitted to any breaches of the Vessel Sales Agreement, much less 27 breaches. Delta Towing points to a spreadsheet prepared by Valdes to reconcile information received from Delta Towing with International's own files as the basis for this claim. (Dkt. 328, at 3) However, Valdes testified that he did not intend (and was not authorized) to commit International to any position regarding any alleged breaches of the Vessel Sales Agreement. (Trial Tr., 250:7-251:12, 253:19-22 (Valdes)) Neither Delta Towing's admission concerning its audit or Valdes' testimony were before Judge McNamara or the Fifth Circuit.

13

particular obligation."). Delta Towing has not contested either of these points.[6] The Court therefore should strictly construe the Vessel Sales Agreement against Delta Towing.

### C.      International Complied With The Use Restrictions.

The Court should enforce the express terms of the Vessel Sales Agreement as written. Condrey v. Suntrust Bank of Ga., 429 F.3d 556, 565-66 (5th Cir. 2005). As Delta Towing's former General Manager admitted, the words of the Vessel Sales Agreement are the best evidence of the parties' intentions. (Trial Tr., 105:20-23 (Matherne))

Under the plain and unambiguous terms of the Vessel Sales Agreement, if International Marine wanted to charter out the Skipper and the Team, it was "obligated to time charter the applicable Vessels to Seller for Seller to enter into Charters Out with customers acceptable to Seller (the "Customer Charterers")." (Joint Ex. 39, ¶ 11F) If Delta Towing was "unable to secure Charters Out for the Vessels within a reasonable time of the Vessels becoming available, [International Marine] may Charter Out either or both of the Vessels at fair market rates directly to Customer Charterers for use in the Covered Trade during all or part of the Covered Term, ...." (Id. (emphasis supplied)) In that case, International Marine had to pay 10 percent of the gross charter hire actually received to Delta Towing. As Delta Towing's former General Manager acknowledged, if International made the boats available to Delta Towing and Delta Towing did not charter them, International could charter the vessels directly to customers. (Trial Tr., 126:10-13 (Matherne))

It is undisputed that International offered to time charter both of the vessels to Delta Towing. (Joint Exs. 41, 46; Trial Tr., 128:4-25, 129:4-130:1, 151:2-10 (Matherne); 197:4-19 (Guy)) It is also undisputed that Delta Towing did not secure any charters for the vessels within a

---

[6]     Delta Towing does contest whether the Court should strictly construe the Vessel Sales Agreement against Delta Towing as drafter of that agreement. (Dkt. 328, at 14)

14

reasonable time after they became available, or indeed at any time. (Id., 63:8-16, 130:2-6, 151:17-25 (Matherne)) This failure was not because Delta Towing thought that the vessels were unavailable, but rather because Delta Towing put the vessels at the bottom of its "availability list" and did not look for any charters. (Id., 59:20-60:7, 61:13-19, 108:8-15, 130:15-19, 151:21-25) Because International offered "to time charter the applicable Vessels to [Delta Towing] for [Delta Towing] to enter into Charters Out" and Delta Towing was "unable to secure Charters Out for the Vessels within a reasonable time of the Vessels becoming available," International could "Charter Out either or both of the Vessels at fair market rates directly to Customer Charterers for use in the Covered Trade during all or part of the Covered Term."

Throughout this case, Delta Towing implied that it had some sort of right of first refusal. (E.g., Trial Tr., 221:15-18) However, as the Delta Towing representative who negotiated the Vessel Sales Agreement admitted, Paragraph 11F is not a right of first refusal. (Vorst Dep., 39:7-12, 50:16-24) Rather, the Vessel Sales Agreement gave Delta Towing the right to "time charter" the vessels if they became available. A "time charter" is a "charter for a specified period, rather than for a specific task or voyage." Tidewater Inc. v. United States, 565 F.3d 299, 303 (5th Cir. 2009) (quoting BLACK'S LAW DICTIONARY 229 (7th ed 1999)). It is "an arrangement of some permanency." Id. (quoting G. Gilmore & C. Black, Jr., THE LAW OF ADMIRALTY, § 4-14, at 229 (2d ed. 1975)). It is undisputed that both parties knew that the vessels were generally available for the period of time until International's barges came online. International gave Delta Towing the opportunity to time charter the vessels during this period. Delta Towing did not do so. International therefore could charter the boats directly to customers.

15

Delta Towing also claims that International had to obtain Delta Towing's approval for customers and rates. (Dkt. 328, at 5) However, nothing in ¶11F required International to do so.[7] In any event, Delta Towing approved United Tugs and Smith Marine as customers (Trial Tr., 156:13-25 (Matherne)), and it has never raised any objections to any of the other customers. International also charged rates between $5,500 and $6,000 per day. (Joint Ex. 1-38) This was higher than the market rates for these vessels at that time. (Trial Tr., 132:23-133:8 (Matherne))

The parties pre-dispute conduct underscores that International complied with the use restrictions in the Vessel Sales Agreement. <u>Northwest Acceptance Corp. v. Heinicke Instruments Co.</u>, 441 F.2d 887, 889 (5th Cir. 1971) <u>Pickren v. United States</u>, 378 F.2d 595, 600 (5th Cir. 1967); La. C.C. art. 2053 ("A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties."). It is undisputed that after International made the vessels available and Delta Towing could not secure any charters for them, a Delta Towing representative instructed International not to "pass any work up" and to let Delta Towing know the rates and start times after-the-fact. (Joint Ex. 49; Trial Tr., 50:25-51:7, 152:18-25 (Matherne); 194:14-16, 200:3-9 (Guy)) For months after that e-mail (from early October 2006 until early March 2007), the parties operated—without any complaint by Delta Towing—with International informing Delta Towing about charters only after-the-fact. (Trial Tr., 156:10-25 (Matherne); 203:5-9 (Guy)) This confirms that the parties understood that International had offered the boats to Delta Towing, Delta Towing had not secured any charters and International therefore could charter out directly to customers.

---

[7]   Likewise, nothing in the Vessel Sales Agreement required International to keep Delta Towing apprised of the vessel's availability on "a daily basis." (Trial Tr., 170:7-15) While Williams offered to have Chiasson update Guy daily, he made this offer as a practical response to a concern about double-booking of the vessels, not because the Vessel Sales Agreement required it. (Joint Ex. 43) There is no evidence that Delta Towing ever took Williams up on this offer or expected "daily" updates before this dispute arose.

16

**II.     If International Did Not Comply Strictly With The Use Provisions, Delta Towing Waived, And Is Estopped From Requiring, Strict Compliance.**

"A party may waive any rights to which he or she is legally entitled, by actions or conduct warranting an inference that a known right has been relinquished." Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc., 601 F.3d 1159, 1181 (5th Cir. 2010). The "acts and circumstances surrounding the performance of a contract may imply an alteration, modification, or waiver of contractual provisions." Wilson v. M/V B911, No. 10-3320, 2012 U.S. Dist. LEXIS 19348, *13 (E.D. La. Feb. 16, 2012) (applying maritime law, citing Stauffer Chem. Co. v. W.D. Brunson, 380 F.2d 174, 182 (5th Cir. 1967)). A party cannot recover liquidated damages if that party "waives or prevents such performance." Dallas-Fort Worth Regional Airport Bd. v. Combustion Equip. Assocs., Inc., 623 F.2d 1032, 1037 (5th Cir. 1980) (citing numerous cases). *See also* Richard A. Lord, 24 WILLISTON ON CONTRACTS § 65:34 (4th ed. 2002) ("It is well settled that the benefits of a liquidated damages provision may be waived by the party for whose benefit it was included in the underlying contract, and that such a waiver may be effected by actions inconsistent with the survival of the rights granted by the provision, as well as formal statements of intent to waive.").

Similarly, estoppel "operates to preclude a party who has made representations of fact through his words or conduct from asserting rights which might perhaps have otherwise existed as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquired some corresponding right." Oxford Shipping Co., Ltd. v. N.H. Trading Corp., 697 F.2d 1, 4 (1st Cir. 1982) (applying maritime law). Under maritime law, the doctrine of estoppel "is designed to aid the law in the administration of justice where without its aid injustice might result." Marine Transp. Servs. Sea-Barge Group, Inc. v. Python High Performance Marine Corp., 16 F.3d 1133, 1138 (11th Cir.

17

1994) (citation omitted). Estoppel requires "(1) a representation of fact by one party contrary to a later asserted position; (2) good faith reliance by another party upon the representation; and (3) a detrimental change in position by the later party due to the reliance." Id. at 1139.

International believes that it complied with the use restrictions in the Vessel Sales Agreement. However, if did not, both waiver and estoppel apply. Delta Towing told International, "If you have a job take it don't pass any work up just let me know a start time and a rate" after-the-fact. (Joint Ex. 49) The parties operated in this manner for many months without any complaint or concern by Delta Towing. It would be manifestly unjust for Delta Towing to agree to one course of conduct, but when International performs as agreed, to ambush International to the tune of $250,000 per occurrence.

Delta Towing makes two arguments in response. First, Delta Towing argues that the October 5, 2006 e-mail concerned only "one prospective charter." (Dkt. 328, at 19)  But, the only reasonable reading of the instruction to not "pass any work up" is as a broad authorization International to take jobs and then notify Delta Towing of the terms after-the-fact. (Joint Ex. 49) The parties' conduct over the months following this e-mail certainly confirmed this common-sense reading. Indeed, until the lawyers became involved years later, Delta Towing's only issue with International concerned the payment of commissions—not liquidated damages. (Trial Tr., 148:17-24, 154:16-18 (Matherne); Mille Dep., 29:19-30:11, 46:10-47:7) Second, Delta Towing argues that Guy lacked authority to send the e-mail on its behalf. (Dkt. 328, at 19) However, Delta Towing's General Manager admittedly authorized the e-mail and Delta Towing does not dispute that the General Manager had the authority to do so. Delta Towing thus waived and is estopped from asserting strict compliance with the use restrictions.

**III.    If International Breached The Use Restrictions, This Is An "Extreme Case" Making Liquidated Damages Inappropriate.**

When the Fifth Circuit upheld the enforceability of the liquidated damages clause, it expressly reserved the issue of "whether the Restatement's 'extreme case' language applies to this situation." International Marine, L.L.C. v. Delta Towing, L.L.C., 704 F.3d 350, 356 n. 6 (5th Cir. 2013). Delta Towing ignores that the Fifth Circuit declined to decide this issue and instead argues that everything has been resolved except the number of breaches. (Dkt. 328, at 21)

As a leading contract treatise explains: "The requirement that some actual loss support an award of stipulated damages has been considered by a number of courts, and it is now generally agreed, in large part by reference to the language of the Restatement (Second) of Contracts, that some actual harm is required to support enforcement of a stipulated damages provision." Richard A. Lord, 24 WILLISTON ON CONTRACTS § 65:33 (4th ed. 2002) (citing Restatement's "extreme case" language and various cases applying it). This is because the purpose of contract damages is compensation, not punishment. Id. The Restatement (Second) of Contracts states, "If, to take an extreme case, it is clear that no loss at all has occurred, a provision fixing a substantial sum as damages is unenforceable." RESTATEMENT (SECOND) OF CONTRACTS § 356, cmt. b (1981). See also Colonial at Lynnfield, Inc. v. Sloan, 870 F.2d 761, 766-67 (1st Cir. 1989) (finding "extreme case" and denying liquidated damages where evidence demonstrated no loss had occurred); Miller v. Nissan Motor Acceptance Corp., No. 99-4953, 2000 U.S. Dist. LEXIS 15645, *101 (E.D. Pa. Oct. 27, 2000) (citing § 356, comment b, in denying liquidated damages claim where no proof of actual harm). See also Trans-Asiatic Oil Ltd., S.S. v. Apex Oil Co., 804 F.2d 773, 782 (1st Cir. 1986) ("Despite the existence of a demurrage clause … such penalty can only be claimed if the shipowner can demonstrate that he has suffered actual damage as a result of the charterer's delay.") (quoting 2B BENEDICT ON ADMIRALTY § 31 (1986)).

19

It is undisputed that Delta Towing did not suffer any actual damages. Delta Towing's General Manager at the time unequivocally testified at trial:

Q.      Right now, sir, Delta Towing is not out of pocket anything as far as you know, correct?

A.      Not beside the liquidated damages.

Q.      Delta Towing never lost any customers?

A.      No.

Q.      Did not lose any profits?

A.      No.

Q.      Did not lose any potential charters?

A.      Not that we know of.

Q.      There is no damages, no actual damages that Delta Towing suffered from not having the names of the customers ahead of time?

A.      After the fact, no. We didn't know it ahead of time, but we didn't know who they were –

Q.      And in fact, after the fact Delta didn't suffer any damages other than late interest on late payments, correct?

A.      Yes.

(Trial Tr., 161:17-162:8 (Matherne)) The individual who negotiated the Vessel Sales Agreement confirmed that Delta Towing did not suffer any damages other than loss of commissions. (Vorst Dep., 55:13-20) Other evidence confirms the lack of any actual damages. The vessels were cold-stacked prior to the sale. (Trial Tr., 108:8-21 (Matherne)) After the sale, they were put at the bottom of Delta Towing's "availability list" and Delta Towing did not look for any charters for those vessels, preferring to charter its own vessels rather than the Team or Skipper. (Id., 59:8-13) Delta Towing never had any need to charter the vessels. The evidence at trial thus proves that

this is an "extreme case" and, as a result, liquidated damages of $250,000 per occurrence is an unenforceable penalty.[8]

## IV.   Delta Towing Has Grossly Inflated the Number of "Incidents or Occurrences."

### A.   Late And Incorrect Payments Do Not Implicate The Liquidated Damages Provisions Of The Vessel Sales Agreement.

The liquidated damages clause does not apply to late or incorrect commission payments. Following settled law often upholding liquidated damages provisions for non-competes because of the difficulty of proving damages for violations of those provisions, Judge McNamara and the Fifth Circuit upheld the validity of the liquidated damages, but only for violations of the non-compete provisions. Neither Judge McNamara nor the Fifth Circuit held it was proper to charge $250,000 to International for making a payment that was one day late, or for paying an invoice issued by Delta Towing that Delta Towing now claims was in the incorrect amount.

Judge McNamara emphasized that "it is clear that the liquidated damages provision focuses on the primary obligation—that is, the restrictions on use or covenant not to compete."[9] (Dkt. 91, at 42) He upheld the validity of the liquidated damages provisions when applied to this primary obligation because of "Delta Towing's concerns regarding loss of market share, future customers or future business" (Id. at 37) and case law recognizing "that damages resulting from covenants not to compete are notoriously difficulty to calculate" (Id. at 38) Judge McNamara did not consider—much less make a similar finding—that a late or incorrect payment implicates

---

[8]   The Court could reach the same conclusion by finding that any breaches were not material. Courts have held that liquidated damages only apply in the case of material breaches of an agreement. See, e.g., United Air Lines, Inc. v. Austin Travel Corp., 867 F.2d 737, 741 (2d Cir. 1989) ("[T]he presumed intent of the parties is that a liquidated damages provision will apply only to material breaches."). Another leading treatise described the application of liquidated damages only to material breaches as the "leading method" for dealing with the issue of the inequities that can arise if liquidated damages are applied to technical violations. Joseph M. Perillo, 11-58 CORBIN ON CONTRACTS § 58.14 (rev. ed. 2013).

[9]   Delta Towing confirmed this during its opening statement: "the essence of Paragraph 11(f) was its non-competition for Delta," not timely payment of commissions. (Trial Tr., 16:22-25)

21

"concerns regarding loss of market share, future customers or future business" or that a court would face any difficulty in calculating damages for a late or incorrect payment. The Fifth Circuit likewise upheld the validity of the liquidated damages based on the "difficulty in estimating damages before a non-competition clause is breached." (Dkt. 182, at 9) Without any specific citation in support, Delta Towing claims that the Fifth Circuit and Judge McNamara made a "particular[] finding" that a failure to pay commissions triggered the liquidated damages provision. (Dkt. 328, at 15) This is incorrect. There is not any such finding.

It is hornbook law that the "failure to pay a sum of money due, will rarely, if ever, justify payment of a further sum, in excess of interest, to be paid by way of liquidated damages …." 22 AM. JUR. 2d, Contracts, § 522 (2d ed. 2003); see also Joseph M. Perillo, 11-58 CORBIN ON CONTRACTS § 58.13 (rev. ed. 2013) ("One case in which courts almost always agree is that, in the absence of legislation, the amount of agreed damages is a penalty and unenforceable where a sum of money is made payable upon default in the payment of a smaller sum of money, and the difference between the two sums is not merely the interest value of the smaller."). This is appropriate given that a court easily can determine damages resulting from late or incorrect payments. See Checkers Eight Ltd. P'ship v. Hawkins, 241 F.3d 558, 562 (7th Cir. 2001) ("Absent exceptional circumstances, actual damages caused by monetary payments being late are not difficult to measure because interest rates can be used to estimate the time value of money.").

Any other conclusion leads to absurd results. For example, the Court should not award $250,000 in damages for a commissions payment that was $105 less than Delta Towing claims that it should have been (Delta Demonstrative at line 5; Joint Ex. 8); $500,000 in damages for two commissions payments that Delta Towing claims were 19 days late (Delta Demonstrative at lines 3-4, Joint Ex. 5-6), or nearly $600,000 in damages because Delta Towing claims that

22

International paid the incorrect amount on one of a series of monthly commissions payments—even though International paid the amount invoiced by Delta Towing. (Delta Demonstrative at line 1; Joint Ex. 4, at 006) The parties did not intend any such obscene late fee.

This principle applies to the failure to make payments after the change of personnel in the operations department. International Chief Financial Officer testified that International's failure was an oversight caused by the personnel changes, and Delta Towing's General Manager confirmed this understanding. (Trial Tr., 244:19-245:11 (Valdes); 139:1-5 (Matherne)) Other evidence supports this conclusion. As Delta Towing admits, International's November 20, 2008 letter (Joint Ex. 58) shows that "Mr. Guidry had taken over for Mr. Chiasson in the operations area around that time." (Dkt. 328, at 11 n. 13) International confirmed its good faith by ending all chartering once its barges came online in the summer of 2007 (Joint Ex. 60; Trial Tr., 153:11-14 (Matherne); 246:18-20 (Valdes); Taylor Dep., 65:2-11) and by tendering checks for more than what was owed after discovering its error. (Joint Ex. 58, 62) International's "miss" on payments after Chiasson left does not implicate the liquidated damages provision.

### B.   If The Court Applies The Liquidated Damages Provision, There Was Only One "Incident or Occurrence."

Delta Towing claims that "International offered no evidence of an alternate number of violations" at trial. (Dkt. 328, at 2) This is incorrect. As International explained before trial (Dkt. 313, at 7-8), under Louisiana law, an "occurrence" means a single cause of damages, even though there are multiple injuries. McKeithen v. The S.S. Frosta, 430 F. Supp. 899, 903-05 (E.D. La. 1977). There is only a single "occurrence" where multiple injuries have resulted from a single policy or procedure by a company or a single, continuous activity by a company. Uniroyal, Inc. v. Home Ins. Co., 707 F. Supp. 1368, 1383-84 (E.D.N.Y. 1988) (multiple deliveries over two years were a single, continuous "occurrence," because they were part of a

23

"routinized, repetitive process"); <u>Transport Ins. Co. v. Lee Way Motor Freight, Inc</u>., 487 F. Supp. 1325, 1329 (N.D. Tex. 1980) (multiple actions taken pursuant to company policy were single "occurrence" under policy); <u>Michaels v. Mutual Marine Office, Inc</u>., 472 F. Supp. 26, 29-30 (S.D.N.Y. 1979) (unloading of cargo over several days was "unified and continuous" activity and was thus a single "occurrence"). Delta Towing has never come forward with any authority supporting an alternate definition of "occurrence."

The evidence at trial showed that if International violated the use restrictions by failing to notify Delta Towing of the availability of the vessels after Chiasson left the company, there is only one "occurrence." The was only one cause of any failures to notify—Chiasson's departure. Because there was only one cause, there was only one "occurrence"—even if there were multiple charters or customers who chartered the vessels after the departure.

Finding a single "incident or occurrence" more than adequately compensates Delta Towing. Liquidated damages are intended to compensate a party for its actual losses, not to impose harsh penalties. <u>Farmers Export Co. v. M/V Georgis Prois</u>, 799 F.2d 159, 163 (5th Cir. 1986) (proper purpose of liquidated damages "is to place the nonbreaching party in the same position in which it would have been without the breach, not to inflict a penalty for nonperformance"). According to Delta Towing's audit, the revenue from the alleged "occurrences" totaled $922,221 and the unpaid commissions totaled $86,482. (Joint Ex. 60) A payment of $250,000 (for a single "incident or occurrence") represents over 27 percent of the total revenue received and nearly three times the commissions that were allegedly not paid.

### C. The Charters To United Tugs And Smith Marine Did Not Violate The Use Restrictions, Much Less Violate Them 28 Times.

United Tugs and Smith Marine account for 28 of the 33 "incidents or occurrences" alleged by Delta Towing. (Delta Demonstrative) However, it is undisputed that International told

24

Delta Towing that it was chartering out the vessels to United Tugs and Smith Marine and that Delta Towing did not raise any issues with those charters. (Joint Ex. 45; Trial Tr., 155:10-156:24 (Matherne)) International paid commissions to Delta Towing for its charters to United Tugs and Smith Marine until the problems caused by Chiasson's departure from the company. (Joint Exs. 1-8; Delta Demonstrative) While International acknowledges that it owed commissions for charters to United Tugs and Smith Marine after Chiasson's departure (and has tendered those commissions), International did not violate the use restrictions in the Vessel Sales Agreement by chartering to United Tugs and Smith Marine.

If chartering to United Tugs and Smith Marine violated the use restrictions, there were not 28 "incidents or occurrences." Delta Towing suggests that each separate job number for United Tugs and Smith Marine represents a separate "incident or occurrence."  This is incorrect. Several examples make this point.

Delta Towing admits that International complied with the use restrictions in chartering both the Team and the Skipper to United Tugs for the period from October 1 through December 31, 2006 (although Delta Towing claims that International made an incorrect payment for the last month). (Delta Demonstrative at item 1; Joint Exs. 1-4) However, Delta Towing claims that invoices for work done for the same customer during this same time period—on December 5-6, December 8-18, and December 26-29—constitute three additional "incidents or occurrences." (Delta Demonstrative at items 6-8; Joint Exs. 9-11) There is no evidence that this work in December 2006 was separate from the December 2006 work reflected in Joint Exhibit 4.  Delta Towing's corporate representative admitted that Delta Towing has no reason to believe that these

invoices represented a separate charter.[10] (Taylor Dep., 104:17-105:12; 108:8-109:23, 109:11-23, 115:18-117:5) Delta Towing nevertheless seeks $750,000 in additional liquidated damages.

Likewise, International invoiced for work done for United Tugs from January 1 through 22, 2007. (Delta Demonstrative, at item 12; Joint Ex. 15) Delta Towing's corporate representative admitted that Delta Towing had no reason to believe that this work was anything other than a continuation of the work from October 1 through December 31, 2006. (Taylor Dep., 112:21-113:9) Delta Towing nevertheless counts this invoice as a separate "incident or occurrence" from the work done for the same customer from October 1 through December 31, 2006 and seeks an additional $250,000 in liquidated damages.

Similarly, for Smith Marine, Delta Towing contends without any explanation, that uninterrupted use of one vessel by one client across a period of several days constitutes five separate "incidents or occurrences." (Delta Demonstrative, at 9-1, 13-14) For example, Smith Marine chartered the Skipper continuously from December 31, 2006 through January 8, 2007, took a day off, and picked back up on January 10, 2007. (Joint Exs. 12-14, 16-17) Delta Towing's corporate representative admitted that Delta Towing does not know whether all of this work was connected and done pursuant to a single charter. (Taylor Dep., 115:18-116:15, 117:2-5, 12-15, 119:9-22) Delta Towing nevertheless counts this work as five separate "incidents or occurrences" generating $1.25 million in liquidated damages. Delta Towing similarly counts

---

[10] These admissions are binding on Delta Towing. See Hyde v. Stanley Tools, 107 F. Supp. 2d 992, 993 (E.D. La. 2000), aff'd 31 Fed. Appx. 151 (5th Cir. 2001) (per curiam) (statements in Rule 30(b)(6) depositions are binding on a corporation). A party cannot contradict its Rule 30(b)(6) testimony except by offering a "reasonable explanation," such as that new evidence has come to light. Id.; see also United States v. Taylor, 166 F.R.D. 356, 362-63 (M.D.N.C. 1996) ("if a party states that it has no knowledge or position as to a set of alleged facts or area of inquiry at a Rule 30(b)(6) deposition, it cannot argue for a contrary position at trial without introducing evidence explaining the reason for the change."). Delta Towing has not offered any explanation as to why it is now able to discern the existence of 33 "incidents or occurrences" when its corporate representative was unable to do so at her deposition.

4843-3004-4951.3

work continuously done for United Tugs on June 15 and 16, 2007 as three separate "incidents or occurrences" (Delta Demonstrative at 26-28; Joint Exs. 29-31)

The arbitrary and inconsistent nature of Delta Towing's calculation of breaches is evident when it argues that the four invoices for the period from December 31, 2006, to January 8, 2007, reflect four separate charters, but that the two invoices for April 27-May 1, 2007, and the two invoices for June 28-July 5, 2007, represent only two charters. (Dkt. 328-1) There is no evidence to support such line-drawing, or any line drawing at all.

If the work done for United Tugs breached the use restrictions, there was only a single "incident or occurrence." It is undisputed that both Smith Marine and United Tugs were existing customers of International and therefore should have had master time charter agreements in place pursuant to which all of the work was done. (Trial Tr., 234:22-25 (Valdes)) Delta Towing did not present any evidence that suggests anything other than the existence of a single charter to United Tugs. As Appendix A makes plain visually, the timing of the work done for United Tugs supports a conclusion of a single "incident or occurrence." That work spanned an uninterrupted time period from September 24, 2006, to January 22, 2007 (Joint Exs. 1-4, 6, 9-11, 17), stopped (except for only one day during the winter season), but then went forward nearly continuously from June 12-21, 2007. (Joint Exs. 20, 29-32, 34) These long periods of continued work, interrupted only by the winter season, suggest a single, continuous charter of the vessels under the master charter agreement.

Similarly, if the work done for Smith Marine breached the use restrictions, there was only a single "incident or occurrence." While the timing of that work is "choppier" than the work for United Tugs, it is consistent with a single "incident or occurrence." (Joint Exs. 12-14, 16, 23-24,

27

36-37) To the extent any doubt exists as to the number of "incidents or occurrences," the Court should not award such a large sum of damages based upon conjecture and inference.

**D.      The Admissions That the Number of Charters Cannot Be Determined From the Documents in the Record Are Binding on Delta Towing**

Delta Towing's calculation of "incidents or occurrences" simply lists the invoices "vessel by vessel." (Taylor Dep., 90:6-8) Delta Towing's corporate representative repeatedly admitted that it was impossible to determine how many "incidents or occurrences" were at issue from the documents in Mille's audit file. (Id., 107:16-109:23, 112:21-113:9, 115:18-117:15, 118:13-23, 119:9-22, 121:2-18) Delta Towing's attempt to ground its arguments regarding the number of "incidents or occurrences" in the same documentation reviewed by Mille and its corporate representative (admitted as Joint Exs. 1-38) contradicts its corporate representative's binding admissions. Allowing a party to contradict its representative's statements in this manner is tantamount to allowing its attorneys to give evidence. Taylor, 166 F.R.D. at 363. Accordingly, the Court should bind Delta Towing to its corporate representative's representation that the documentation in this case does not provide sufficient information with which to determine the number of charters (and therefore, the number of "incidents or occurrences") worked by the two vessels. Hyde, 107 F. Supp. 2d at 993.

**V.      Delta Towing Is Not Entitled to Pre-Judgment Interest on Liquidated Damages**

The Fifth Circuit has held that an award of pre-judgment interest is not appropriate when a party does not prove any actual damages, but instead receives only liquidated damages. Montelongo v. Meese, 803 F.2d 1341, 1354 (5th Cir. 1986). An award of prejudgment interest on the liquidated damages "does not serve to make [the plaintiff] any more whole." Id. (citing Rodgers v. United States, 332 U.S. 371, 373 (1947)). Given Delta Towing's admission that it has

4843-3004-4951.3

no actual damages, it is not entitled to pre-judgment interest. (Trial Tr., 161:17-162:4 (Matherne); Vorst Dep., 55:13-20)

## VI.   Delta Towing Did Not Give International the Opportunity to Cure Required by the Parent Company Guaranty

Pursuant to Paragraph 3.2 of the Parent Company Guaranty, in the event of International Marine's "failure to pay or perform any Obligation under the [Vessel Sales Agreement], and upon written demand by [Delta Towing] stating it has provided written notice of default to [International Marine] and [International Marine] has not corrected the default within thirty (30) days, [International Offshore] agrees to pay and perform all of the Obligations as and when due." (Joint Ex. 40, at 2) Delta Towing has not offered any evidence that it complied with Paragraph 3.2 and gave International Marine the opportunity to cure its default within thirty days, or that it sent International Offshore the required written demand after such cure period. Accordingly, a necessary precondition to International Offshore's liability under the Parent Company Guaranty has not been satisfied and no judgment for breach may lie against International Offshore. See La. C.C. art. 1993 ("In case of reciprocal obligations, the obligor of one may not be put in default unless the obligor of the other has performed or is ready to perform his own obligation.").

## Conclusion

The evidence at trial showed that International complied with plain and unambiguous terms of the use restrictions contained in the Vessel Sales Agreement. To the extent that International did not strictly comply, Delta Towing waived and is estopped from requiring strict compliance. As to damages, the Fifth Circuit expressly left open the issue of whether this was an "extreme case" where the application of liquidated damages was inappropriate. The evidence at trial showed that this in fact is an "extreme case" because Delta Towing admittedly did not suffer any actual damages. International's late or incorrect payments do not implicate the liquidated

29

damages provisions. Finally, Delta Towing has grossly overstated the number of "incidents or occurrences" resulting in liquidated damages. To the extent that Delta Towing proves that International violated the use restrictions (which International denies), the evidence at trial showed that there is only one "incident or occurrence."

Christmas is over. Santa Claus has returned to the North Pole. A court of justice is not a lottery or an appropriate place for a "get rich quick" scheme. Delta Towing has not proven that it is entitled to any damages, much less more than $12.5 million. The Court therefore should enter judgment in favor of International.

17th day of January, 2014

Respectfully submitted:

FOLEY & LARDNER LLP

By:   /s/       James D. Dasso

James D. Dasso
FOLEY & LARDNER LLP
321 North Clark Street
Chicago, Illinois 60654
Telephone:  (312) 832-4500
Facsimile:   (312) 832-4700

-and-

Harry J. "Skip" Philips
TAYLOR, PORTER, BROOKS & PHILLIPS LLP
8th Floor, Chase Tower South
451 Florida Street
Baton Rouge, Louisiana 70821
Telephone: 225.387.3221

*Attorneys for International Marine, L.L.C. and*
*International Offshore Services, L.L.C.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was automatically served upon all counsel of record via this Court's ECF filing system on January 17, 2013, upon the filing of the foregoing.


By:      /s/ James D. Dasso
James D. Dasso, Admitted Pro Hac Vice

4843-3004-4951.3