**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| INTERNATIONAL MARINE, LLC, ET AL. | CIVIL ACTION |
| VERSUS | NO. 10-0044 |
| DELTA TOWING LLC | SECTION "L" (2) |

## FINDINGS OF FACT & CONCLUSIONS OF LAW

In 2009, Delta Towing, now known as FDT, LLC, ("Delta") brought this action against International Marine, LLC and International Offshore Services, LLC (collectively, "International") for breach of a vessel sales agreement ("VSA"). The forum selection clause in the VSA required that the parties resolve their dispute in this Court, and International then brought the present action seeking a declaratory judgment that it had not breached the VSA and that the liquidated damages clause in the VSA was unenforceable. The matter was initially assigned to Judge McNamara.

On March 11, 2011, Judge McNamara issued an order holding that the liquidated damages provision was enforceable. He did not resolve the issue of damages. Following Judge McNamara's retirement, the case was transferred to this section of the Court. Thereafter, International then filed a motion for reconsideration of Judge McNamara's order. On February 13, 2012, this Court reaffirmed the validity of the liquidated damages clause after considering new evidence and testimony. International moved to certify the judgment as final or, in the alternative, moved for interlocutory appeal. On March 16, 2012, this Court certified the order as a final judgment pursuant to Federal Rule of Civil Procedure 54(b). International then appealed. On January 8, 2013, the United States Court of Appeals for the Fifth Circuit affirmed the

judgment. Specifically, it found that the liquidated damages clause in the VSA was enforceable. In doing so, it noted that "[n]otwithstanding the [February 13, 2012, order's] express reservation of the damages issue for trial, we note that the total damages claimed are so large because International breached the non-competition provision at least twenty-seven times" and that it was "loathe to find the [provision] unenforceable merely because International adopted a pattern of disregarding its contractual obligations." (Rec. Doc. 182 at 10 n.4).

The matter was returned to this Court for further proceedings and came on for trial without a jury on December 16 and 17, 2013, for the purpose of determining liability and damages. After considering the testimony of the witnesses, the exhibits admitted into evidence, and the memoranda submitted by the parties, the Court now makes the following findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52. To the extent that a finding of fact constitutes a conclusion of law, the Court adopts it as such; to the extent that a conclusion of law constitutes a finding of fact, the Court also adopts that as such.

## I.      FINDINGS OF FACT

### A.      Sale

Delta owned several offshore tugboats, including the TEAM and the SKIPPER. The TEAM is a 3600-class tugboat built in 1979 and rebuilt in 1999, and the SKIPPER is a 3000-class tugboat built 1973 and rebuilt in 1998. Both tugboats were sold to International on September 8, 2006, for $4 million by operation of the VSA. Darren Vorst signed the VSA on behalf of Delta and Stephen Williams signed it on behalf of International.

When the sale occurred, Delta was a wholly owned subsidiary of The Offshore Drilling Company ("TODCO"). TODCO was later sold to Hercules Offshore, Inc., and Delta became a

wholly owned subsidiary of Hercules. On May 13, 2011, Delta sold most of its assets and some of its liabilities to Crosby Marine Transportation, LLC. Delta did not assign or convey the VSA or its interest in the VSA, nor any rights, claims, and benefits accruing from it. On March 27, 2012, Delta changed its name to FDT, LLC. FDT, LLC is a limited liability company duly organized and existing under the laws of Delaware and maintains its principal place of business in Louisiana. At the time of the sale, International Offshore agreed to be bound by the covenants and agreements of the VSA by executing a joinder. International Offshore guaranteed International Marine's payment and performance obligations under the VSA by executing a parent company guarantee dated September 8, 2006.

At issue are the non-compete clause, liquidated damages clause, and amendment, modification, and waiver clause contained in the VSA.

### 1.      Non-Compete Clause

At the time of the sale, the vessels were "cold-stacked" and not in service. Because Delta did not want International to use the vessels to compete with Delta's business in the Gulf of Mexico, the VSA contained a non-compete provision that allowed International to use the vessels to move International's own crew and equipment in the Gulf of Mexico, and limited its ability to charter the vessels out to any customers for a period of five years. Pursuant to the non-compete clause, if International wished to charter the vessels in the Gulf of Mexico to its own customers, it would first be required to charter the vessels to Delta for Delta to re-charter to its own clients, in which case Delta would forward 90% of the charter revenue to International. If Delta elected to not charter the vessels to its own clients, then International could charter the vessels for work in the Gulf of Mexico but would be required to forward 10% of the charter

revenue to Delta within 15 days of payment. Stated differently, regardless of who arranged for

the charter, Delta would receive 10% and International would receive 90% of the charter

revenue. The contract expressly stated that this provision was intended to ensure that

International would use the vessels only for its own use.

### 2.    Liquidated Damages Clause

The contract also contained a liquidated damages clause. For each breach of the non-

compete clause, the liquidated damages clause provided damages of the greater of $250,000.00

or the gross revenue earned in violation. The VSA also expressly stated that the liquidated

damages provision was not a penalty and was consideration for Delta selling the two vessels at a

discount as well as "a good faith reasonable estimate of the damages [Delta] would suffer." The

liquidated damages provision reads as follows:

> Liquidated Damages. The consideration for the [the non-
> compete clause] and this [clause] is that the above Purchase Price
> is below the fair market price of the Vessels at the time of sale and
> other good and valuable consideration the receipt and sufficiency
> of which is hereby acknowledged and confessed. In the event
> Buyer or its affiliated companies or other subsequent owner,
> manager, or charterer of the Vessels violates any of the covenants
> and agreements in paragraph 11F, Buyer shall pay to Seller as
> liquidated damages, and not as a penalty, the greater of (i) the sum
> of Two Hundred Fifty Thousand and no/100 Dollars ($250,000.00)
> per incident or occurrence or (ii) if applicable the gross amount of
> revenue earned in violation of such covenant and agreement with
> respect to the incident or occurrence in question . . . . All liquidated
> damages shall be payable within 30 days of notice of the violation.
> It is understood that the resultant damages of any such breach of
> the covenants and agreements contained in [the non-compete
> clause] would be difficult to ascertain with certainty but that the
> amount stipulated herein is a good faith reasonable estimate of the
> damages Seller would suffer . . . . In no event shall any party or the
> affiliated companies thereof or the respective shareholders,
> officers, directors, employees, agents, or representatives thereof

circumvent or attempt to circumvent the provisions of [the non-compete clause] or this [clause] by any means, direct or indirect.

### 3.    Amendment, Modification, & Waiver Clause

Additionally, the VSA outlined the process for amendment or modification of the agreement in an amendment, modification, and waiver clause. It states:

> Entire Agreement/Severability. This Agreement, and all agreements referenced herein, contain the entire agreement between the parties with respect to the transactions contemplated hereby and supersedes all prior agreements, commitments, understandings, or representations, written or oral, with respect to the subject matter hereof. There are no representations or warranties by either party not expressly set forth in this Agreement and no other purported representations or warranties may be relied upon by either party. This Agreement shall not be amended, modified or waived except in writing signed by the parties. The invalidity, illegality or unenforceability of any provision or any part of any provision of this Agreement shall not affect the continuation in force of such other part or the remainder of this Agreement.

Neither Delta nor International executed any written amendment, modification, or waiver of International's obligations under the non-compete clause of the VSA or International's liability under the liquidated damages clause of the VSA. Further, Delta has not sought to amend, modify, or waive any term of the VSA. Nor has Delta represented, agreed, or indicated that amendment, modification, and waiver clause's "executed writing" requirement is inapplicable to the non-compete or liquidated damages clauses of the VSA.

International suggests that the terms of the VSA were waived or otherwise altered by Ricky Guy. Mr. Guy served as the assistant operations manager at Delta towing from 2005 through 2007. In his position, Mr. Guy was responsible for Delta's inland operations, not those in the Gulf of Mexico. He was not responsible for monitoring International's compliance with the

VSA. Further, in his position, he did not have the authority to enter into, modify, or waive the terms of the VSA on behalf of Delta. Nor was such authority ever delegated to him. Neither Mr. Guy nor anyone else associated with Delta made any representation to International that Mr. Guy possessed such authority. The credible evidence and testimony makes it clear that Delta never agreed—either in writing or orally—to alter the VSA.

      **B.**    **Audits**

On or about July 24, 2008, Delta notified International of its suspicion that International had failed to comply with the non-compete clause in the VSA and requested an audit of International's books and records. This request went unheeded, and on October 20, 2008, Delta made a second request. On November 20, 2008, International responded and attempted to remit payment of $53,293.33 to Delta, but without complete documentation. Delta did not accept the funds, and instead invoked its audit rights and audited International's books and records in early 2009. The audit was performed by Nacy Mille, an employee of Hercules, on behalf of Delta. Mr. Mille collected documentation concerning charters of the TEAM and the SKIPPER, including invoices and receipts. On February 20, 2009, International attempted to remit payment of an additional $37,657.00 in commissions over the $53,293.00 amount. Again, Delta did not accept the funds. Counsel for Delta then sent International a letter alleging 36 breaches of the VSA by International and demanded payment of liquidated damages for each and sought enforcement of the parent company guarantee. On February 27, 2009, counsel for International rejected the Delta demand. Since then, International has not made any payment in response to the demand. International performed its own audit, which indicates that it did not pay Delta on 27 occasions for charters of the SKIPPER or TEAM.

### C.    Charters

At trial, the parties presented evidence and testimony with regard to each of the alleged charters. Following the sale of the TEAM and the SKIPPER by Delta to International, International chartered out the tugboats in the Gulf of Mexico from September 2006 to July 2007 to seven different third parties. In doing so, the credible evidence and testimony establishes that International violated the non-compete clause of the VSA on multiple occasions, each of which is described below.

International routinely failed to notify Delta that the tugboats were available, and either charter them to Delta so that Delta could re-charter the tugboats themselves or—if Delta declined to charter them—obtain Delta's approval of the proposed charterer, the duration, and the hire rate. Further, International routinely failed to remit 10% of the gross hire actually received from the charterer within 15 days after the charter hire.

Although International made payment to Delta for some charters, those payments were either tardy or incorrect, or both. With respect to the other charters, International never made any payment. During the covered term, International never contacted Delta before it chartered the TEAM or the SKIPPER to discuss or decide upon the duration and hire rate for those charters. Each of these charters constitutes a breach and makes International liable under the liquidated damages clause. Absent notification, it was reasonable for Delta to assume that International was using the tugboats internally as contemplated by the VSA.

Each of the following charters of the SKIPPER or the TEAM violated the terms of the non-compete clause, thereby triggering the liquidated damages clause.

### 1.   Charter 06-5263

International entered a time-charter with United Tugs for the TEAM in the covered trade lasting from September 24 to December 31, 2006, and invoiced United Tugs on a monthly basis. This was referred to as International job number 06-5263. International made several payments to Delta for this time-charter, several of which were timely and the last of which was untimely.

For example, on October 16, 2006, International sent invoice number 5263 to United Tugs seeking remittance of $39,000.00 under the time-charter for the period lasting from September 24 to 30, 2006. United Tugs paid invoice number 5263 on December 21, 2006. Thereafter, International timely paid Delta $3,900.00 on January 5, 2007.

On November 10, 2006, International sent invoice number 52631 to United Tugs seeking remittance of $186,000.00 for the period lasting from October 1 to 31, 2006. United Tugs paid invoice number 52631 on January 4, 2007. Thereafter, International timely paid Delta $18,600.00 on January 5, 2007.

On November 30, 2006, International sent invoice number 52632 to United Tugs seeking remittance of $180,000.00 for the period lasting from November 1 to 30, 2006. United Tugs paid invoice number 52632 on February 6, 2007. Thereafter, International timely paid Delta $18,000.00 on February 12, 2007.

Thereafter, things changed. On December 31, 2006, International sent invoice number 52633 to United Tugs seeking remittance of $186,000.00 for the period lasting from December 1 to 31, 2006. United Tugs paid invoice number 52633 on March 13, 2007, requiring International to pay Delta on or before March 27, 2007. International paid Delta $2,400.00 of the $18,600 owed on March 15, 2007, but only paid the remaining $16,200.00 owed after Delta's audit of

International. Accordingly, this last payment for the charter was untimely under the terms of the VSA.

### 2.      Charter 06-5267

From October 8 to 14, 2006, International entered a time-charter with Smith Marine for the SKIPPER, referred to as International job number 06-5267. On November 2, 2006, International sent invoice number 5267 seeking remittance of $38,500.00. It was paid on February 14, 2007, requiring International to pay Delta on or before March 1, 2007. International paid $3,500.00 of the $3,850.00 owed to Delta on March 2, 2007 and the remaining amount following Delta's audit of International's books and records. Accordingly, this payment was late under the terms of the VSA.

### 3.      Charter 06-5277

International entered a time-charter with United Tugs for the SKIPPER from November 3 to 8, 2006, which was referred to as International job number 06-577. On November 22, 2006, International sent invoice number 5277 to United Tugs seeking remittance of $30,250.00. It was paid on January 24, 2007, requiring International to pay Delta on or before February 8, 2007. International paid Delta $3,025.00 on February 27, 2007. Accordingly, the payment was untimely under the terms of the VSA.

### 4.      Charter 06-5280

International entered a time-charter with Smith Marine for the SKIPPER from November 17 to 20, 2006, which was referred to as International job number 06-5280. On November 28, 2006, International sent invoice 5280 to Smith Marine seeking remittance of $16,800.00. It was paid on January 24, 2007, requiring International to pay Delta on February 8, 2007. International

paid Delta $1,680.00 on February 27, 2007. Accordingly, this payment was untimely under the terms of the VSA.

### 5.   Charter 06-5282

International entered a time-charter with Smith Marine for the SKIPPER from November 20 to 27, 2006, which was referred to as International job number 06-5282. On November 30, 2006, International sent invoice 5282 to Smith Marine seeking remittance of $40,249.99. It was paid on March 19, 2007, requiring International to pay Delta on April 3, 2007. International paid Delta $3,92.000 of the $4,025.00 owed on March 22, 2007. Accordingly, this payment was untimely under the terms of the VSA.

### 6.   Charter 06-5288

International entered a time-charter with United Tugs for the SKIPPER from December 5 to 6, 2006, which was referred to as International job number 06-5288. On December 28, 2006, International sent invoice 5288 to United Tugs seeking remittance of $15,900.00. It was paid on February 26, 2007, requiring International to pay Delta on March 13, 2007. International did not inform Delta of this time-charter. Delta rejected International's November 20, 2008, attempt to pay.

### 7.   Charter 06-5290

International entered a time-charter with United Tugs for the SKIPPER from December 8 to 18, 2006, which was referred to as International job number 06-5290. On December 28, 2006, International sent invoice 5290 to United Tugs seeking remittance of $57,400.00. It was paid on February 26, 2007, requiring International to pay Delta on March 13, 2007. International did not

inform Delta of this time-charter. Delta rejected International's November 20, 2008, attempt to pay.

### 8.    Charter 06-5296

International entered a time-charter with United Tugs for the SKIPPER from December 26 to 29, 2006, which was referred to as International job number 06-5296. On December 31, 2006, International sent invoice 5296 to United Tugs seeking remittance of $16,500.00. It was paid on March 13, 2007, requiring International to pay Delta on March 28, 2007. International did not inform Delta of this time-charter. Delta rejected International's November 20, 2008, attempt to pay.

### 9.    Charter 06-5298

International entered a time-charter with Smith Marine for the SKIPPER on December 31, 2006, from 4:30 a.m. to 8:30 a.m., which was referred to as International job number 06-5298. On December 31, 2006, International sent invoice 5298 to Smith Marine seeking remittance of $2,800.00. It was paid on March 19, 2007, requiring International to pay Delta on April 3, 2007. International did not inform Delta of this time-charter. Delta rejected International's November 20, 2008, attempt to pay.

### 10.    Charter 06-5299

International entered a time-charter with Smith Marine for the SKIPPER again on December 31, 2006, from 8:30 a.m. to 11 a.m., which was referred to as International job number 06-5299. On December 31, 2006, International sent invoice 5299 to Smith Marine seeking remittance of $1,750.00. It was paid on March 6, 2007, requiring International to pay

11

Delta on March 21, 2007. International did not inform Delta of this time-charter. Delta rejected International's November 20, 2008, attempt to pay.

### 11.    Charter 06-5300

International entered a time-charter with Smith Marine for the SKIPPER again on December 31, 2006, from 11 a.m. to midnight, which was referred to as International job number 06-5230. On December 31, 2006, International sent invoice 5230 to Smith Marine seeking remittance of $3,033.33. It was paid on March 6, 2007, requiring International to pay Delta on March 21, 2007. International did not inform Delta of this time-charter. Delta rejected International's November 20, 2008, attempt to pay.

### 12.    Charter 07-5341

International entered a time-charter with Smith Marine for the SKIPPER from January 1 to 8, 2007, which was referred to as International job number 07-5314. On January 11, 2007, International sent invoice 5341 to Smith Marine seeking remittance of $42,000.00. It was paid on March 6, 2007, requiring International to pay Delta on March 21, 2007. International did not inform Delta of this time-charter. Further, On February 13, 2007, International told Delta that neither the SKIPPER nor the TEAM had been chartered during this period. Delta rejected International's November 20, 2008, attempt to pay.

### 13.    Charter 07-5352

International entered a time-charter with Smith Marine for the SKIPPER on January 10, 2007, which was referred to as International job number 07-5352. On January 10, 2007, International sent invoice 5352 to Smith Marine seeking remittance of $5,250.00 It was paid on February 6, 2007, requiring International to pay Delta on February 21, 2007. International did

not inform Delta of this time-charter. Further, On February 13, 2007, International told Delta that neither the SKIPPER nor the TEAM had been chartered during this period. Delta rejected International's November 20, 2008, attempt to pay.

### 14.    Charter 07-5332

International entered a time-charter with United Tugs for the TEAM from January 1 to 22, 2007, which was referred to as International job number 07-5332. On January 31, 2007, International sent invoice 5332 to United Tugs seeking remittance of $129,000.00. It was paid on April 23, 2007, requiring International to pay Delta on May 8, 2007. International did not inform Delta of this time-charter. Further, On February 13, 2007, International told Delta that neither the SKIPPER nor the TEAM had been chartered during this period. Delta rejected International's November 20, 2008, attempt to pay.

### 15.    Charter 07-5368

International entered a time-charter with Apache Corporation for the SKIPPER from February 8 to 10, 2007, which was referred to as International job number 07-5368. On February 15, 2014, International sent invoice 5368 to Apache Corporation seeking remittance of $15,500.00. It was paid on March 29, 2007, requiring International to pay Delta on April 13, 2007. International did not inform Delta of this time-charter. Further, On March 2, 2007, International told Delta that neither the SKIPPER nor the TEAM had been chartered during this period. Delta rejected International's February 20, 2009, attempt to pay.

### 16.    Charter 07-5387

International entered a time-charter with LA Carriers, Inc. for the TEAM from March 11 to 18, 2007, which was referred to as International job number 07-5387. On March 30, 2007,

International sent invoice 5387 to LA Carriers, Inc. seeking remittance of $41,325.00. It was paid on June 8, 2007, requiring International to pay Delta on June 23, 2007. International did not inform Delta of this time-charter. Delta rejected International's February 20, 2009, attempt to pay.

### 17.    Charter 07-5397

International entered a time-charter with United Tugs for the SKIPPER on March 24, 2007, which was referred to as International job number 07-5397. On March 30, 2007, International sent invoice 5397 to United Tugs seeking remittance of $2,200.00. It was paid on June 20, 2007, requiring International to pay Delta on July 5, 2007. International did not inform Delta of this time-charter. Delta rejected International's February 20, 2009, attempt to pay.

### 18.    Charter 07-5398

International entered a time-charter with Smith Marine for the SKIPPER on March 24, 2007, which was referred to as International job number 07-5398. On March 30, 2007, International sent invoice 5398 to Smith Marine seeking remittance of $1,650.00. It was paid on April 24, 2007, requiring International to pay Delta on May 9, 2007. International did not inform Delta of this time-charter. Delta rejected International's February 20, 2009, attempt to pay.

### 19.    Charter 07-5400

International entered a time-charter with Offshore Service Vessels for the SKIPPER on March 27, 2007, which was referred to as International job number 07-5400. On March 30, 2007, International sent invoice 5400 to Offshore Service Vessels seeking remittance of $3,300.00. It was paid on April 20, 2007, requiring International to pay Delta on May 5, 2007. International

did not inform Delta of this time-charter. Delta rejected International's February 20, 2009, attempt to pay.

### 20.       Charter 07-5420

International entered a time-charter with Smith Marine for the SKIPPER on April 27, 2007, until May 1, 2007, which was referred to as International job number 07-5420. On March 30, 2007, International sent invoice 5420 to Smith Marine seeking remittance of $22,000.00, and on May 9, 2007, it sent invoice 54201 seeking remittance of $4,125.00. It was paid on August 7, 2007, requiring International to pay Delta on August 22, 2007.

### 21.       Charter 07-5426

International entered a time-charter with Smith Marine for the SKIPPER from May 4 to 17, 2007, which was referred to as International job number 07-5426. On May 31, 2007, International sent invoice 5426 to Smith Marine seeking remittance of $74,250.00. It was paid on September 4, 2007, requiring International to pay Delta on September 19, 2007. International did not inform Delta of this time-charter. Delta rejected International's February 20, 2009, attempt to pay.

### 22.       Charter 07-5442

International entered a time-charter with Smith Marine for the SKIPPER from May 27 to 28, 2007, which was referred to as International job number 07-5442. On May 31, 2007, International sent invoice 5442 to Smith Marine seeking remittance of $11,275.00. It was paid on July 13, 2007, requiring International to pay Delta on July 28, 2007. International did not inform Delta of this time-charter. Delta rejected International's February 20, 2009, attempt to pay.

### 23.     Charter 07-5454

International entered a time-charter with Tetra Technologies for the SKIPPER from June 5 to 7, 2007, which was referred to as International job number 07-5454. On June 19, 2007, International sent invoice 5454 to Tetra Technologies seeking remittance of $17,250.00. It was paid on August 16, 2007, requiring International to pay Delta on August 31, 2007. International did not inform Delta of this time-charter. Delta rejected International's February 20, 2009, attempt to pay.

### 24.     Charter 07-5459

International entered a time-charter with Smith Marine for the SKIPPER on June 11, 2007, which was referred to as International job number 07-5459. On June 30, 2007, International sent invoice 5459 to Smith Marine seeking remittance of $2,475.00. It was paid on August 7, 2007, requiring International to pay Delta on August 22, 2007. International did not inform Delta of this time-charter. Delta rejected International's February 20, 2009, attempt to pay.

### 25.     Charter 07-5460

International entered a time-charter with United Tugs for the TEAM on June 12, 2007, which was referred to as International job number 07-5460. On June 19, 2007, International sent invoice 5460 to United Tugs seeking remittance of $2,925.00. It was paid on August 2, 2007, requiring International to pay Delta on August 17, 2007. International did not inform Delta of this time-charter. Delta rejected International's February 20, 2009, attempt to pay.

### 26.     Charter 07-5462

International entered a time-charter with United Tugs for the SKIPPER from June 15, 2007, from 11 a.m. until 9 p.m., which was referred to as International job number 07-5462. On

June 30, 2007, International sent invoice 5462 to United Tugs seeking remittance of $6,000.00 It

was paid on September 12, 2007, requiring International to pay Delta on September 27, 2007.

International did not inform Delta of this time-charter. Delta rejected International's February 20,

2009, attempt to pay.

### 27.   Charter 07-5463

International entered a time-charter with United Tugs for the SKIPPER from June 15,

2007, at 9 p.m., to June 16, 2007, at 9 a.m., which was referred to as International job number

07-5463. On June 30, 2007, International sent invoice 5463 to United Tugs seeking remittance of

$7,800.00. It was paid on August 15, 2007, requiring International to pay Delta on August 30,

2007. International did not inform Delta of this time-charter. Delta rejected International's

February 20, 2009, attempt to pay.

### 28.   Charter 07-5464

International entered a time-charter with United Tugs for the SKIPPER from June 16,

2007, at 9 a.m. to 10:30 p.m., which was referred to as International job number 07-5464. On

June 30, 2007, International sent invoice 5464 to United Tugs seeking remittance of $8,100.00. It

was paid on August 15, 2007, requiring International to pay Delta on August 30, 2007.

International did not inform Delta of this time-charter. Delta rejected International's February 20,

2009, attempt to pay.

### 29.   Charter 07-5465

International entered a time-charter with Smith Marine for the SKIPPER from June 17 to

25, 2007, which was referred to as International job number 07-5465. On June 30, 2007,

International sent invoice 5465 to Smith Marine seeking remittance of $41,600.00. It was paid on

September 26, 2007, requiring International to pay Delta on October 11, 2007. International did not inform Delta of this time-charter. Delta rejected International's February 20, 2009, attempt to pay.

### 30.    Charter 07-5468

International entered a time-charter with United Tugs for the TEAM from June 20 to 21, 2007, which was referred to as International job number 07-5468. On June 26, 2007, International sent invoice 5468 to United Tugs seeking remittance of $17,225.00. It was paid on August 27, 2007, requiring International to pay Delta on September 11, 2007. International did not inform Delta of this time-charter. Delta rejected International's February 20, 2009, attempt to pay.

### 31.    Charter 07-5469

International entered a time-charter with Smith Marine for the TEAM on June 22, 2007, which was referred to as International job number 07-5469. On June 26, 2007, International sent invoice 5469 to Smith Marine seeking remittance of $10,800.00. It was paid on December 10, 2007, requiring International to pay Delta on December 25, 2007. International did not inform Delta of this time-charter. Delta rejected International's February 20, 2009, attempt to pay.

### 32.    Charter 07-5481

International entered a time-charter with Smith Marine for the SKIPPER from June 28, 2007, to July 5, 2007, which was referred to as International job number 07-5481. On June 30, 2007, International sent invoice 5481 to Smith Marine seeking remittance of $13,750.00, and on July 6, 2007, it sent invoice 54811 seeking remittance of 27,500.00. It was paid on August 7,

2007, requiring International to pay Delta on August 22, 2007. International did not inform Delta of this time-charter. Delta rejected International's February 20, 2009, attempt to pay.

### 33.    Charter 07-5487

International entered a time-charter with Cal Dive International Marine for the SKIPPER from July 7, 2007, to July 15, 2007, which was referred to as International job number 07-5487. On July 19, 2007, International sent invoice 5487 to Cal Dive International Marine seeking remittance of $45,520.00. It was paid on October 4, 2007, requiring International to pay Delta on October 19, 2007. International did not inform Delta of this time-charter. Delta rejected International's February 20, 2009, attempt to pay.

## II.    CONCLUSIONS OF LAW

### A.    Jurisdiction

This Court has jurisdiction over this maritime contract action pursuant to 28 U.S.C. § 1333 and § 1367. (Rec. Doc. 13).

### B.    Damages

The VSA is a valid, enforceable contract, as is the liquidated damages clause. (*See* Rec. Doc. 182). Previously, this Court has concluded that the liquidated damages clause was enforceable and that International is liable for liquidated damages as a result of any breach. (*See* Rec. Docs. 91, 149). The United States Court of Appeals for the Fifth Circuit affirmed this conclusion. (Rec. Doc. 182). It further denied a request for rehearing.

"Interpretation of the terms of a contract is a matter of law." *Weathersby v. Conoco Oil Co.*, 752 F.2d 953, 956 (5th Cir. 1984). When interpreting a maritime contract, the general rules of contract construction and interpretation apply. *See Marine Overseas Services, Inc. v. Crossocean Shipping, Co. Inc.*, 791 F.2d 1227 (5th Cir. 1986); *Ogea v. Loffland Brothers Co.*,

19

622 F.2d 186 (5th Cir. 1980). Thus, the terms of a contract should be "given their plain meaning unless the provision is ambiguous." *Weathersby*, 752 F.2d at 956. "A contract is not ambiguous if 'its language as a whole is clear, explicit, and leads to no absurd consequences, and as such it can be given only one reasonable interpretation.'" *Cargill, Inc. v. Kopalnia Rydultowy Motor Vessel*, 304 Fed. App'x 278, 282 (5th Cir. 2008) (quoting *Chembulk Trading, LLC v. Chemex Ltd.*, 393 F.3d 550, 555 n.6 (5th Cir. 2004)). Here, the terms of the non-compete and liquidated damages clauses are unambiguous, and are therefore must be given their ordinary and plain meaning.

By its express terms, the VSA's liquidated damages clause is triggered by any violation of the non-compete clause. The non-compete clause generally prohibited International from chartering the TEAM or the SKIPPER between September 8, 2006, and September 8, 2011, unless it met certain conditions. Specifically, International was required to notify Delta that the tugboats were available so that Delta could charter them for the purpose of re-chartering to Delta customers. If Delta did not charter them out, International could charter them to International customers provided Delta agreed to the charterer, the duration, and the hire rate. In such an instance, International was then required to remit 10% of the gross hire actually received from its charterer within 15 day of the charter hire. Pursuant to the liquidated damages clause, International is required to pay $250,000.00 per incident or occurrence. Any violation of the non-compete clause is clearly such an incident or occurrence. Thus, each instance in which International failed to comply with one or more of the non-compete clause's requirements constituted a violation subject to the liquidated damages clause.

A "charter party" (often shortened to "charter") is a contract for the lease of a vessel by an owner to a charterer. *Great Circle Lines, Ltd. v. Matheson & Co., Ltd.*, 681 F.2d 121 (2d Cir. 1982). A charter, which is subject to the rules of federal maritime law, may be formed orally or in writing. *Id.* A "voyage" or "time" charter occurs if an owner provides a vessel and its crew for a particular task or duration. *Id.* The owner retains control of the vessel. *Id.*

After the sale of the TEAM and the SKIPPER, International entered into 33 separate time charters with third parties in the covered trade and during the covered term. Each of these is discussed above. In each instance, International generally failed to abide by its pre- or post-charter obligations under the non-compete clause. Therefore, each of these 33 separate time charters constitutes an independent violation of the non-compete clause and triggers the liquidated damages clause. Accordingly, International must pay $250,000.00 for each of these 33 violations, amounting to $8.25 million.

### C.    Judicial Interest

Additionally, Delta is entitled to prejudgment interest. "Under maritime law, the awarding of prejudgment interest is the rule rather than the exception, and, in practice, is well-nigh automatic." *Reeled Tubing, Inc. v. M/V Chad G*, 794 F.2d 1026, 1028 (5th Cir. 1986).

"Prejudgment interest is usually awarded to the date of loss to ensure that the injured plaintiff is compensated for the use of funds to which the plaintiff was entitled, but which the defendant had use of prior to judgment." *Id*. Here, the loss primarily occurred in 2007. However, as Third Party Defendant Stephen Valdes notes, the liquidated damages clause provides that any such damages are payable 30 days after notice. Delta provided notice to International on February 20, 2009. "Setting the rate of interest on a judgment is within the trial court's broad

discretion." *Id.* at 1029. "[A]dmiralty courts may look to reasonable guideposts indicating a fair level of compensation." *Id.* In Louisiana, the effective judicial interest rate for 2009 is 5.5% per annum. *See* LA. REV. STAT. § 13:4202(b). Accordingly, the prejudgment interest rate is set at 5.5% per annum.

Further, the parent guaranty is a valid, enforceable contract. Thus, International Offshore is liable for International Marine's obligations under that contract. International Marine's liability under the liquidated damages clause constitutes an obligation arising under or in connection with the VSA, which International Offshore unconditionally guaranteed. Accordingly, International Offshore is liable as a primary obligor. It appears that all conditions precedent to Delta's right to payment under the parent guarantee are been satisfied.[1]

### D.    Waiver

This Court and the Fifth Circuit have previously concluded that Delta did not waive its rights under the non-compete and liquidated damages clauses of the VSA. "As a general rule if the issues were decided, either expressly or by necessary implication, those determinations of law will be binding . . . ." *Daly v. Sprague*, 742 F.2d 896, 901 (5th Cir. 1984). Here, the waiver issue had been previously raised in the parties' memoranda and was closely tied to conclusions of this Court and the Fifth Circuit. Accordingly, it is unnecessary to address waiver. However, to the extent this issue was not previously resolved, it is abundantly clear that neither Delta nor anyone with apparent or actual authority to act on its behalf has waived any term of the VSA or

---

[1] Under the terms of the parent company guarantee, International Offshore's liability includes Delta's costs and expenses, including attorneys' fees, in seeking to enforce International Marine's obligations. However, Delta has indicated that it will address this issue in a subsequent motion.

any of the attendant agreements expressly or impliedly, or through course of dealing, course of performance, or course of conduct.

### E.    Accord & Satisfaction

This Court and the Fifth Circuit have previously concluded that International's attempt to make late payment did not cure its breach under the doctrine of accord and satisfaction. Accordingly, it is unnecessary to address accord and satisfaction.

### F.    Estoppel

Delta is not estopped from asserting its rights under the VSA. As noted above, Delta has not made any express or implied representation inconsistent with the terms of the VSA. Delta sought to have International to perform its obligations as outlined by the parties' agreement.

## III.    CONCLUSION

On the basis of the above findings of fact and conclusions of law, the Court finds 33 incidents or occurrences in which International breached the non-compete clause in the VSA and, in so doing, became liable for liquidated damages. Accordingly, **IT IS ORDERED** that International pay Delta $8.25 million in addition to judicial interest at the rate of 5.5% from February 20, 2009. The Court defers resolution of the issue of costs and expenses, as well as attorneys' fees.

New Orleans, Louisiana, this 27th day of June, 2014.

UNITED STATES DISTRICT JUDGE